No. 51,574

Dante G. Scarpelli, M.D., *Appellee,* v. Nolan Jones, Charles K. Lee, Ernest Turner and Charles Floyd, *Appellants.*

(626 P.2d 785)

Opinion filed February 26, 1981.

*Reid F. Holbrook,* of Holbrook and Ellis, P.A., of Kansas City, and *Lee J. Dunn, Jr.,* of Chicago, Illinois, argued the cause and were on the brief for the appellee.

*James I. Meyerson,* of the National Association for the Advancement of Colored People, of New York, New York, argued the cause and *Charles E. Carter* and *Thomas I. Atkins,* of the same association; *Elmer C. Jackson, Jr.,* of Kansas City, *Victor Goode* and *Patricia Goins,* of the National Conference of Black Lawyers of New York, New York; and *Herbert O. Reid,* of Howard University School of Law, Washington, D.C., were with him on the brief for the appellants.

*Chester Lewis,* of Wichita, and *Ralph R. Smith,* of the University of Pennsylvania Law School, Philadelphia, Pennsylvania, were on the brief *amicus curiae* for The Affirmative Action Coordinating Center, *et al.*

*William Rich,* of the Washburn University School of Law, of Topeka, was on the brief *amicus curiae* for The American Civil Liberties Union of Kansas.

The opinion of the court was delivered by

Herd, J.: This is an appeal by defendants Nolan Jones, Ernest Turner, Charles K. Lee and Charles Floyd, in a libel action brought by plaintiff Dante G. Scarpelli. The jury awarded Scarpelli a judgment against each defendant in the amount of $1,000 compensatory damages and $10,000 punitive damages.

Dante G. Scarpelli, M.D. was a professor and the chairman of the department of pathology from 1966 to 1976 and dean for faculties and academic affairs from January 1972 to August 1973 at the University of Kansas Medical School in Kansas City, Kansas. Scarpelli is now chairman of the pathology department of Northwestern University, Evanston, Illinois. The four defend-

ants were medical students at the University of Kansas Medical School at the time this action arose and are now graduates of that institution; all of them are black persons. Chester J. Rempson was originally a defendant but was severed from the action prior to the trial. He is also black and was assistant vice-chancellor for affirmative action at the University of Kansas Medical School at all times pertinent hereto.

In the early 1970's, the University of Kansas Medical School had a faculty of approximately 500. The curriculum was four years, with approximately four black students in each class. The faculty became conscious of the scarcity of minority admissions and launched a program with the goal of encouraging minority recruitment and admission to the medical school. As a result of the university program, Chester J. Rempson was employed as assistant vice-chancellor for affirmative action charged with the responsibility of administering the guidelines for minority admissions programs. The stated purpose of the programs was to devise and administer enrichment programs for educationally disadvantaged minorities, encompassing financial and tutorial assistance with reduced curriculum requirements. These amounted to special programs for minority students beginning with the first year of medical school oriented particularly toward math, science, curriculum and medical terminology. Prior to the creation of the minorities program, admissions had been predicated on college grade point average (GPA) and medical college admission test (MCAT) scores with no attention given to race. The minority admissions program permitted admission of minorities to medical school with a lower MCAT and undergraduate GPA than for non-minority students. The medical school faculty clearly intended there was to be only one standard for graduation for all students, in spite of the lowered admissions standard.

None of the defendants had GPA's or MCAT scores that would have admitted them under a non-minority admissions standard. The four defendants were all admitted to the University of Kansas Medical School under the minority admissions program. With the exception of Lee, the defendants experienced much academic difficulty with basic sciences which required the repeating of courses, remedial work and some makeup courses in other medical schools, as anticipated in the minority admissions program.

The academic performance of medical students, including

those in the minority program, is the responsibility of the medical school faculty which operates with a committee system. The principal committee charged with academic responsibilities is the academic committee which is composed of members elected by the faculty and students elected by the medical student assembly. When a student's performance is deemed substandard by a department, the departmental decision is transmitted to the academic committee for review. The academic committee considers the departmental recommendation and makes its recommendation to the entire faculty for final disposition.

In addition to the academic committee, the University of Kansas Medical School is administered by and through a number of administrative positions which are called deans. Two of the deanships important to this controversy are: David Waxman, M.D., dean of students, and Dante G. Scarpelli, M.D., Ph.D., dean for faculties and academic affairs. The dean for faculties and academic affairs is responsible for all academic programs and, together with the dean of students, receives and evaluates reports from various faculty committees. He is also responsible for implementing the academic policy of the medical school which includes the minority admissions program.

Dante Scarpelli was born in Padua, Italy. He and his parents immigrated to America when he was fourteen months of age. They settled in the Italian section of Cleveland, where plaintiff grew up. He served in the Marine Corps during World War II and was later graduated from Baldwin-Wallace College. Scarpelli then entered Ohio State University Medical School from which he received his M.D. and Ph.D. in pathology in 1954. Following residency programs and assistant professorships at Ohio State, plaintiff was employed by the University of Kansas to serve as a professor and chairman of the department of pathology in 1966. Under the leadership of Dr. Scarpelli the department of pathology at the University of Kansas attained a ranking of among the top ten of all pathology departments in the United States. Dr. Scarpelli set high standards for himself and his students which were reflected by his students' high scores on the National Board of Medical Exams; on some occasions the University of Kansas Medical School ranked as high as 12th out of the 125 medical schools in the United States. Dr. Scarpelli acquired a reputation for demanding high standards of excellence from his students.

The four defendants were the executive committee of the student national medical association (SNMA) of the University of Kansas Medical School. SNMA is primarily a black students' organization and, at that time, Charles Floyd was its chairman. SNMA held meetings for the mutual benefit of its members and discussed their progress in medical school. From the meetings came a consensus that the pathology department of the University of Kansas Medical School and, more particularly, Dr. Scarpelli were discriminating against black students.

The defendants consulted with Chester J. Rempson and he agreed with the students' conclusion. In the summer of 1973, defendants Turner and Jones also talked with Dr. Robert Hudson, chairman of the department of history and philosophy of medicine, about taking action against Scarpelli for what they considered discriminatory practices. Hudson had a good rapport with the students and was supportive of the minority admissions program. Hudson told Turner and Jones he believed Scarpelli's standards were artificially high but they were applicable to all students regardless of race. He did not believe Scarpelli was racially prejudiced. After talking with Hudson, the students spoke with Dr. William O. Reike, vice-chancellor for health affairs. He suggested they put their grievances in writing and submit them to Dr. E. B. Brown, Jr., who later succeeded Scarpelli as dean of faculties and academic affairs. The defendants accepted Reike's advice and on April 3, 1974, filed a complaint on behalf of the SNMA charging Scarpelli with:

"[W]illful and unlawful acts of discrimination toward black medical students at the University of Kansas Medical Center in an attempt to *systematically eliminate* them from medical school and depriving them of an opportunity of achieving a medical education, through individual acts, conspiratorial efforts and inciting the Kansas University Medical Faculty to discriminate against black students . . . ."

The complaint charged such action was in violation of the medical school's affirmative action program, Title VI of the 1964 Civil Rights Act, Title VII and Title VIII of the Public Health Service Act, as amended by the Comprehensive Health Manpower Training Act of 1971, and the Kansas Act against Discrimination K.S.A. 1980 Supp. 44-1001 *et seq.* The complaint lists several incidents involving altercations between Scarpelli and the defendants and other black medical students as proof of the allegations. Some of those incidents will be discussed in more detail in this opinion.

Dr. Brown responded to the complaint with a letter stating the "charges will be investigated and you will receive a detailed answer from me as soon as this has been accomplished."

The medical school had never adopted a student-faculty grievance procedure at the time the complaint was filed. Dr. Brown asked the university attorney, Lee Dunn, to draft a procedure, which he did. Although the proposed grievance procedure was not formally adopted by the faculty, Brown chose to use it for the complaint against Scarpelli. It provided for a formal hearing before five faculty members chosen by Dr. Brown. The presiding member of the panel was a lawyer. The procedure contemplated an adversary proceeding similar to an ordinary court trial, subject only to a relaxation of the rules of evidence.

The hearing was set for May 28, 1974. The complainants were given official notice of the date of the hearing and the format with the names of the members of the hearing committee on May 10, 1974. The notice also advised the students they must disclose their witnesses and evidence to Dr. Scarpelli prior to the hearing.

When the complaining students learned Dr. Brown was going to appoint a hearing committee and that attorney Lee Dunn was representing Dr. Scarpelli, they wrote to Dr. Brown requesting that they be consulted regarding the selection of the members of the panel to hear the complaint. In addition, they questioned the conflict of interest presented by the presence of attorney Lee Dunn, maintaining he had been providing legal counsel to Scarpelli and the faculty.

On May 22, 1974, the students requested additional time in order to prepare their case and asked that the hearing be postponed. Brown denied the request on May 23, 1974.

At the hearing on May 28, 1974, the complainants present were Ernest Turner and Nolan Jones. Charles Lee was in Chicago on business concerning an internship and Charles Floyd was enrolled at the University of Mississippi taking a make-up course in pathology. Dr. Dante Scarpelli was present, represented by Lee Dunn. Turner renewed the students' objections to the format and rules of the proceeding. Chairman McNish overruled the objections. Turner called the meeting a "stacked deck;" then he and Nolan Jones walked out. Rempson was also present with the complainants and he remained to argue about the procedure. The

committee found in favor of Dr. Scarpelli and dismissed the complaint with prejudice.

Plaintiff filed this action on February 13, 1975, alleging the four defendants and Chester Rempson defamed him by filing the grievance and that they also interfered with his right to privacy, and his contractual rights, and maliciously prosecuted him and violated his federally guaranteed civil rights. This case was tried twice. The first trial resulted in a hung jury. Prior to the first trial, the court granted the defendants summary judgment on the charges of malicious prosecution and violation of civil rights. At the conclusion of plaintiff's case, the court directed a verdict for defendants on the causes of action relating to invasion of privacy and interference with contractual rights. The jury heard the case on the question of libel and could not agree.

Defendant Rempson was severed from the action prior to the second trial which started on October 29, 1979. The trial court again granted defendants summary judgment on malicious prosecution and violation of plaintiff's civil rights. As in the first trial, the trial court also directed a verdict for defendants on invasion of privacy and interference with plaintiff's contractual rights. Libel was the only remaining issue. The case was submitted to the jury November 14, 1979, and the jury rendered its verdict in favor of plaintiff three days later. Defendants' motions for judgment notwithstanding the verdict and a new trial were denied and this appeal followed.

Defendants contend the district court committed reversible error in refusing to direct a verdict for the defendant at the close of plaintiff's case in chief. This allegation goes to the heart of plaintiff's libel suit.

In *Frevele v. McAloon,* 222 Kan. 295, Syl. ¶ 5, 564 P.2d 508 (1977), this court, in addressing the issue of the appropriate standards to be applied on a motion for a directed verdict stated:

"In ruling on a motion for a directed verdict, pursuant to K.S.A. 60-250, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted to the jury. The same basic rule governs appellate review of a motion for a directed verdict."

See also *White v. New Hampshire Ins. Co.,* 227 Kan. 293, 297, 607 P.2d 43 (1980); *Care Display Inc. v. Didde-Glaser, Inc.,* 225 Kan. 232, Syl. ¶ 5, 589 P.2d 599 (1979); *Simpson v. Davis,* 219 Kan. 584, Syl. ¶ 3, 549 P.2d 950 (1976).

216

Examining plaintiff's evidence in his case in chief, we must resolve all facts and inferences reasonably to be drawn therefrom in favor of Dr. Scarpelli and if reasonable minds can differ on the conclusions to be reached, the trial court's ruling must be affirmed. To do this, we must consider the requirements for a prima facie case for libel.

Civil libel is a limitation on freedom of speech and press guaranteed in the First Amendment to the U.S. Constitution under the theory that individuals should be free to enjoy their reputations unimpaired by false and defamatory publications. We have held for public policy reasons that communications made within the official functions of the executive, legislative and judicial branches of government are absolutely privileged. *Bradford v. Mahan,* 219 Kan. 450, 548 P.2d 1223 (1976); *Schulze v. Coykendall,* 218 Kan. 653, 659, 545 P.2d 392 (1976); Prosser, Law of Torts § 114 (4th ed. 1971).

Defamatory publications concerning public officials and public figures are qualifiedly privileged and recovery requires proof of actual malice. *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L.Ed.2d 686, 84 S.Ct. 710 (1964); *Hein v. Lacy,* 228 Kan. 249, 616 P.2d 277 (1980); *Gleichenhaus v. Carlyle,* 226 Kan. 167, 170, 597 P.2d 611 (1979); *Schulze v. Coykendall,* 218 Kan. 653; *Bradford v. Mahan,* 219 Kan. 450.

"Proof of actual malice when a conditional privilege is found to exist requires a plaintiff to prove that the publication was made with knowledge that the defamatory statement was false or with reckless disregard of whether it was false or not." *Dobbyn v. Nelson,* 2 Kan. App. 2d 358, 360, 579 P.2d 721, *aff'd* 225 Kan. 56, 587 P.2d 315 (1978).

When a communication is qualifiedly privileged, unless the defendants act with knowledge of falsity or reckless disregard for truth or falsity, lack of reasonable care to investigate will not defeat the privilege. *Dobbyn v. Nelson,* 2 Kan. App. 2d 358. See also 50 Am. Jur., Libel and Slander § 198, p. 705; Westerbeke, *Survey of Kansas Law: Torts,* 27 Kan. L. Rev. 321 (1979). In addition, we recognize a qualified privilege where a defamatory statement is "made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, if it is made to a person with a corresponding interest or duty." *Senogles v. Security Benefit Life Ins. Co.,* 217 Kan. 438, Syl. ¶ 3, 536 P.2d 1358 (1975).

The published statements in the instant case are subject to the requirements of qualified privilege. They were made about a subject matter in which the defendants had an interest and made to a person with a corresponding interest or duty. *Dobbyn v. Nelson,* 2 Kan. App. 2d 358, Syl. ¶ 3. In addition, the trial court made a finding that Dr. Dante G. Scarpelli was a public figure. That finding was not appealed.

Dr. Scarpelli, therefore, is obligated to prove the publication of defamatory statements and, if they are defamatory, that the statements were made with actual malice. The complaint accused plaintiff of "racism" and involvement in a conspiracy to discriminate. Additionally, it accused plaintiff of violating state and federal law. We have examined the evidence in this case and we find the issue of defamation was a proper question to submit to the jury based on the question of whether the statements made in the complaint were libelous. There was substantial evidence introduced by the plaintiff in support of his allegations in the petition. We find plaintiff also made a prima facie case for the falsity of the complaint.

The final question: Does the evidence show the defendants knew the defamatory statements were false or that they recklessly disregarded whether or not the statements were false? We must review the record to examine the atmosphere in which the black students found themselves and the conditions under which the complaint was made. Additionally, we will review the evidence surrounding several of the specific instances enumerated in the complaint.

Defendants, three of whom were in academic difficulty, were the executive board of a black students' organization. All of the defendants were admitted to the medical school as the result of an affirmative action program adopted by the university in the early 1970's. Most of the medical school faculty was in favor of the program. Dr. Scarpelli was opposed to lowering admissions standards in order to obtain minority students but gave lip service to the program. He acquired a reputation in the student body and faculty as an opponent of affirmative action. The university hired Chester J. Rempson, a black Ph.D., as assistant vice-chancellor for affirmative action charged with providing educational, personal and financial counseling and aid to minority students. Mr.

Rempson attended faculty and academic committee meetings. The evidence is unclear whether or not he had a vote in those meetings. The evidence is, however, quite clear that Rempson and Scarpelli clashed from the very beginning, culminating in Scarpelli's resignation as dean of faculties and academic affairs in August, 1973. In a letter to William O. Reike, M.D., vice-chancellor for health affairs, Scarpelli stated he found Rempson to be "unqualified to make academic decisions, militant, intransigent and unreasonable in his dealings with others concerning minority students in academic difficulty." He categorized his academic philosophies and those of Rempson's as "miles apart." It should be noted Rempson was the official counsellor and advisor to the defendants. He had been hired by the medical school for that purpose. Rempson was a concerned advocate for black students. The students reciprocated by trusting and believing Dr. Rempson, who participated in faculty meetings. The on-going conflict between Scarpelli and Rempson was well known to the black students.

As to some of the specific instances indicating Scarpelli's prejudices, we note the following incidents enumerated in the complaint. In a faculty meeting in March or April, 1973, Scarpelli said, "[I]f maintaining high standards makes me a racist, bigot or redneck, then so be it." Rempson related the statement to the black students who interpreted it to mean Scarpelli acknowledged his racism.

On January 24, 1974, Scarpelli wrote Rempson a memo regarding an article written by Norman S. Blackman, M.D., discussing minority admissions standards. The attached article was in opposition to affirmative action and ended with this statement:

"The medical profession is obligated to provide competent physicians for the future. Each man or woman who, in good faith, applies for admission to the medical school does so as a minority of one. In the best interests of the public and that individual, each applicant should be evaluated solely on his or her abilities."

Scarpelli's memo stated he believed the article had been written by "a truly enlightened black man [who] tells it as it should be, and sadly is not." The memo closed with Scarpelli stating he agreed with the author's conclusion that medical school admissions should be evaluated "solely on the basis of ability," rather than considering minority status.

Mr. Rempson replied to Scarpelli January 25, 1974, as follows:

"I thank you very much for the article by Dr. Norman S. Blackman. Needless to say, I think *ability* should play an important role in the selection process, but which *indices* determine ability among minorities, especially blacks, whose ancestors were slaves and still today blacks are denied equal access to education, vocational and technical training, jobs, housing, etc. I think it is still too early in the game to now demand *all* minority candidates be equal to all majority candidates when a society has virtually made it impossible for them to be equal, historically. Of course, there are always exceptions to the rule, not with standing my Phi Beta Kappa Key (IBK). But, that young black who burned Watts, Chicago, Detroit, Cleveland and New York is still waiting for America to live up to her ideals and the next time the black communities will not be the *only* communities burning. Black people are only asking to be given a chance. It has been the middle class black who has benefited the most. The majority of the poor blacks have not.

"So, you can see Dr. Norman S. Blackman has made it and he is rapidly trying to close the door behind him. I have nothing but contempt for him.

"The blood, sweat, tears and humiliation of blacks help build this country. Personally speaking, members of my family have fought in every major war this country has been in and as far back as the Civil War. Dr. Blackman and nobody else is going to stop black people from achieving their rightful place in this society.

"In a system that has been unfair Dr. Blackman and his myopia now offer equality to people who in most instances lack the means to compete. In a society where 97 per cent of all jobs which pay over $15,000 are controlled by white males, that now minorities must compete on an equal basis. Everything costs and credentials to function in this Society also cost. How does one propose that those without the means get those credentials? If one says this lies outside his scope of concern and ability to help, then I say he is blind and denies the spirit of liberty." (Emphasis in original.)

Scarpelli replied stating he was "deeply disappointed by the content [of Rempson's memo]." In addition, he accused Rempson of having lost his objectivity.

Rempson and the black students interpreted this exchange as further proof of Scarpelli's opposition to black and minority admissions programs. Neither party realized Dr. Blackman was not black until much later.

At another juncture in 1974, Dr. Scarpelli wrote Dr. Charles Lee a letter of congratulations on his receipt of certain honors stating Dr. Lee "was a credit to his race." Dr. Lee interpreted the letter to be racist and was indignant about it.

Defendant Ernest Turner had difficulty in passing anatomy while attending the University of Kansas Medical School and petitioned the faculty for permission to take a remedial course at the University of Nebraska. When the motion was considered, Dr. Scarpelli cast the lone dissenting vote. Turner satisfactorily completed the course at Nebraska and returned to K.U. for eventual

graduation. Dr. Scarpelli testified he opposed Turner's request because he thought remedial work should be conducted by the school granting the degree. His reasoning was sound and meritorious but it appeared to the black students, in light of his reputation and what they heard through Rempson, that Dr. Scarpelli was opposing Turner because of his race.

The father of Tom Bettis, another black medical student, died shortly before final examinations. Due to absence because of family responsibilities, Bettis failed several examinations. Scarpelli refused to permit him to repeat them. Later Bettis was removed from a State Board of Healing Arts exam by Scarpelli because of lack of eligibility. Scarpelli then recommended Bettis for the school of nursing after he failed medical school, stating Bettis had "both educational and cultural deficiencies." The black students attached racial connotations to all of the incidents.

The wife of Dr. Charles Floyd, one of the defendants, was terminally ill while Floyd was a student. He became deficient in pathology and requested permission to go to the University of Mississippi to retake the course. Over Dr. Scarpelli's objections, the faculty permitted Floyd to take the Mississippi course. He successfully completed the course and returned to graduate.

The complaint lists several other incidents of this nature between Scarpelli and other black medical students. The complaint also charges Scarpelli with having actively attempted to introduce stricter retention rules for minority students. All of these incidents came to the attention of the black students as a result of individual observation, conversations with other students or through consultation with Rempson. All of the incidents were viewed as Scarpelli's attempt to slowly rid the medical school of its minority students and prevent others from entering.

The black students were convinced Scarpelli was discriminating against them. As evidence that this belief was genuine and not motivated by malice or reckless disregard of whether the charges were false or not, we note the testimony of Dr. Hudson. At trial, when asked his opinion of the belief of defendants Turner and Jones, he stated (questions by Mr. Meyerson, answers by Dr. Hudson):

A. "I think they were convinced that they were being discriminated against on the basis of race."

   . . . . .

Q. "Now, did you have an opinion, when they asked if the filing of the complaint would hurt Dr. Scarpelli, that that was their purpose; that is, to hurt him?"

A. "Well, I certainly had the feeling they felt wronged by Dr. Scarpelli and wished to redress that wrong by some means or other."

. . . .

Q. "Now, I believe in your direct testimony you indicated, Dr. Hudson, that you felt that it was your impression they were absolutely convinced that they were discriminated against. Is that a fair recapitulation of your testimony?"
A. "Yes."
Q. "What was it that led you to conclude that or to come to that impression?"

. . . .

A. "I think I would have trouble pinpointing a single item in that regard. It was just an accumulation of materials that they had put together which they interpreted to read this, and certainly there was no lack of sincerity in the way they were presenting it to me."

. . . .

Q. "And you didn't have any belief that they didn't have a sincere belief that they were being discriminated against for which they should seek redress?"

. . . .

A. "No. I had been convinced of their sincerity, yes."

Upon being asked by defendants' counsel to discuss the faculty division on affirmative action, Dr. Hudson stated:

A. "There was those who believed that all students should arrive at the medical school equally qualified, or at least sufficiently qualified that they didn't need any special treatment in order to either be admitted or to get pre-pared . . . ."

. . . .

Q. "And do I understand that on other matters, such as minority admissions, you didn't hold Dr. Scarpelli in particularly high esteem?"
A. "That's right."

. . . .

Q. "Do you have any knowledge which would lead you to believe that the doctors maliciously filed this complaint which is the focus of this lawsuit?"

. . . .

A. "No."

Dr. Scarpelli argues the failure of two of the complaining students to appear at the hearing and the action of the other two in walking out left him without his day in court and is evidence of malice and indicates an effort to discredit him.

As stated earlier, defendants Lee and Floyd were absent from the hearing for legitimate reasons and that absence cannot be considered deliberate. The action by Turner and Jones of walking out of the hearing was unfortunate, but did not represent a malicious act. The students were aware of Dr. Scarpelli's reputation and they had been advised by Rempson that plaintiff was

opposed to them and the SNMA because of their race. Rempson attended faculty meetings and was an official of the university to assist the black students. He had their trust and he was credible. The students had good reason to believe his version of occurrences. In addition, the students cumulatively and with other black students knew of specific instances where Scarpelli had interceded against black students such as Tom Bettis, Ernest Turner and Charles Floyd. With this background and knowledge, they discussed their suspicions with university officials who advised them to state their grievances in writing. When the complaint was filed, they were informed university officials would investigate the charges and report the findings. It is clear they did not expect a formal hearing. When the defendants realized the charges were to be aired and reviewed at a formal hearing, they requested the right to choose some of the panel members and requested a continuance in order to prepare for such an investigation. Those requests were either ignored or denied and the students believed the university had made its decision. Augmenting this feeling was the realization that the university's attorney, Dunn, was to represent Scarpelli, giving the impression all objectivity was gone. Given this set of circumstances, we cannot find the defendants' action was motivated by a malicious desire to tarnish Dr. Scarpelli's reputation.

In addition, we find plaintiff's trial testimony reveals his feeling about the actions of the defendants. (Questions by Mr. Meyerson, answers by Dr. Scarpelli.)

Q. "Do you have any evidence that those students, then students, these doctors here, at the time they filed their complaint, under the circumstances, did not seriously believe that that which they were complaining about they believed was serious?"

. . . .

A. "If they went so far as to level the charges that they did and avail themselves of the various approaches to making these charges that they did, I would suspect that they did, indeed, believe it; and if I may make one additional statement to that, I would like to point out that were I caught in the same situation I might have believed it too, because to be in a situation where you're continuously and chronically on the precipice of not passing a course to which you have committed your life, it must be so frustrating that one would lash out in any direction and do something that was probably not prudent. I might have done the same thing."

Viewing all the evidence in the light most favorable to Dr. Scarpelli, giving it every reasonable inference in light of all the

evidence including the testimony of Dr. Robert Hudson and the plaintiff, there is no evidence the complaint was published with knowledge of its falsity or in reckless disregard for the truth or falsity of its contents. The defendants filed the complaint in good faith to redress an actual grievance which they perceived from their view of the evidence. This is not to say the complaint is true. It is to say there is no evidence of actual malice or reckless disregard for truth or falsity in its publication. The trial court should have sustained defendant's motion for a directed verdict at the close of plaintiff's case in chief.

The judgment of the trial court is reversed and judgment entered for the defendants. Costs are assessed to the plaintiff.