No. 54,286

JOHN L. HANRAHAN & CAROL J. HANRAHAN, *Appellants,* v. CHARLES
D. HORN and KANSAS ASSOCIATION OF REALTORS, INC., *Appellees.*

(657 P.2d 561)

Opinion filed
January 14, 1983.

*Donald R. Hoffman,* of Humpage, Berger & Hoffman, of Topeka, argued the
cause and was on the briefs for the appellants.

*Gerald L. Goodell,* of Goodell, Stratton, Edmonds, Palmer & Wright, of
Topeka, argued the cause, and *Marla J. Luckert,* of the same firm, was with him
on the brief for the appellees.

The opinion of the court was delivered by

WILLIAM D. CLEMENT, District Judge, Assigned: The trial court
granted summary judgment for the defendants on Mr. and Mrs.
John Hanrahan's claims of slander, outrage, defamation of char-
acter, and invasion of privacy. This is an appeal from summary
judgment.

The sequence of events relevant to this action began on May 20,
1979, when twelve-year-old John "Jack" Hanrahan disappeared,
having last been seen at Gage Bowl in Topeka. His body was
found 10 days later and William R. Gautney was charged with
murder. Almost 70 news stories appeared in Topeka newspapers
through August. The names of the murdered boy's parents, ap-
pellants, or references to the Hanrahan family, were mentioned in
virtually every story.

On June 20, 1979, Charles Horn, as part of his employment
with the Kansas Association of Realtors, Inc., was conducting a
pre-licensure class for prospective realtors. During a break in the
afternoon session he received a call from his wife. She told him

she had heard that Mr. Hanrahan was being held for questioning by police concerning Jack Hanrahan's death. Charles Horn returned to his class and said, "Have you heard the most up-to-the-minute news in the Hanrahan case? They have a suspect in custody. And it is the boy's own father." That evening Charles Horn told the class: "Regarding the information I gave you earlier today, that information is not for public knowledge. Or it is not for publication." In his deposition, Charles Horn stated his announcement to the class, which he could not remember word for word, was to demonstrate his earlier statement was wrong. He said he apologized for making the earlier statement. Mr. Hanrahan was at no time questioned as a suspect for the murder of his son. The Hanrahans sought redress by filing a suit against Charles Horn and the Kansas Association of Realtors, Inc. The suit was dismissed after summary judgment was granted to all defendants on all claims.

Summary judgment is proper when the only question or questions presented are questions of law. In considering a motion for summary judgment, the party against whom the motion is directed is entitled to the benefit of all reasonable inferences and doubts that may be drawn from the facts. When genuine issues of material fact remain undetermined, the granting of summary judgment is improper. *Griffin v. Rogers,* 232 Kan. 168, 653 P.2d 463 (1982).

The trial court ruled the appellant, John Hanrahan, was a public figure when Horn's statements were made. The standard of actual malice, defined as knowledge the statement was false or made with reckless disregard to whether it was false, was found not to be met. Appellants contend the trial court erred in finding John Hanrahan a public figure. The question of whether there is a qualified privilege based on the status of the appellant is one of law. See *Schulze v. Coykendall,* 218 Kan. 653, 545 P.2d 392 (1976); *Dobbyn v. Nelson,* 2 Kan. App. 2d 358, 579 P.2d 721, *aff'd* 225 Kan. 56 (1978).

There is a delicate balance between First Amendment freedoms of speech and press and the legitimate interest in redressing wrongful injury resulting from defamatory statements. "Public figure" status is an attempt to fine tune this balance. See *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 18 L.Ed.2d 1094, 87 S.Ct. 1975, *reh. denied* 389 U.S. 889 (1967).

Justice Powell, in the case of *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 41 L.Ed.2d 789, 94 S.Ct. 2997 (1974), elaborated on public figure status:

"In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." p. 351.

"Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare." p. 345.

In *Time, Inc. v. Firestone,* 424 U.S. 448, 47 L.Ed.2d 154, 96 S.Ct. 958 (1976), a case similar to the present case, Justice Rehnquist wrote:

"Petitioner contends that because the Firestone divorce was characterized by the Florida Supreme Court as a 'cause celebre,' it must have been a public controversy and respondent must be considered a public figure. But in so doing petitioner seeks to equate 'public controversy' with all controversies of interest to the public. Were we to accept this reasoning, we would reinstate the doctrine advanced in the plurality opinion in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29 [29 L.Ed.2d 296, 91 S.Ct. 1811] (1971), which concluded that the *New York Times* privilege should be extended to falsehoods defamatory of private persons whenever the statements concern matters of general or public interest. In *Gertz,* however, the Court repudiated this position, stating that 'extension of the *New York Times* test proposed by the *Rosenbloom* plurality would abridge [a] legitimate state interest to a degree that we find unacceptable.' 418 U.S. at 346 [41 L.Ed.2d 789, 94 S.Ct. 2997 (1974)]." p. 454.

Justice Rehnquist further discussed public figures in *Wolston v. Reader's Digest Assn., Inc.,* 443 U.S. 157, 61 L.Ed.2d 450, 99 S.Ct. 2701 (1979):

"In *Gertz,* we held that an attorney was not a public figure even though he voluntarily associated himself with a case that was certain to receive extensive media exposure. 418 U.S. at 352 [41 L.Ed.2d 789, 94 S.Ct. 2997 (1974)]. We emphasized that a court must focus on the 'nature and extent of an individual's participation in the particular controversy giving rise to the defamation.' " p. 167.

See also *Hutchinson v. Proxmire,* 443 U.S. 111, 61 L.Ed.2d 411, 99 S.Ct. 2675 (1979); Annot., 61 L.Ed.2d 975; Annot., 75 A.L.R.3d 616; Eaton, *The American Law of Defamation through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer,* 61 Va. L. Rev. 1349 (1975); Ashdown, *Gertz and Firestone: A Study in Constitutional Policy-Making,* 61 Minn. L. Rev. 645 (1977).

Appellees contend community concern for children is the

public controversy in this case, and that John Hanrahan is a public figure. The trial court concluded, as a matter of law, that in the summer months of 1979, during the intense publicity surrounding the disappearance and death of their son, the appellants became public figures.

The appellants were not public figures. The trilogy of cases quoted, *Gertz, Firestone* and *Wolston,* limits the status of public figure to those who seek to influence the resolution of public questions. *Wolston,* 443 U.S. at 168. The parents of the murdered young boy only sought to find their son. No public questions were involved. The parents did not call for better police protection or any other means of protecting Topeka children. The parents did not draw attention to themselves to influence the public. See *Wolston,* 443 U.S. at 168. The appellants did not engage in criminal conduct, which alone does not automatically make one a public figure anyway. *Wolston,* 443 U.S. at 168. The appellants' search for their son was a matter of public interest, but this is not enough to create a public figure. *Gertz* altered the public interest standard stated in *Rosenbloom v. Metromedia,* 403 U.S. 29, 29 L.Ed.2d 296, 91 S.Ct. 1811 (1971). The focus is on the nature and extent of an individual's participation in the particular controversy giving rise to the defamation. *Wolston,* 443 U.S. at 167. There was not the requisite participation in a public controversy, or even the public controversy itself. A "controversy" is a difference marked especially by the expression of opposing views. Webster's Third New International Dictionary, p. 497 (1967).

Kansas has followed the standards set by the United States Supreme Court. The Kansas Supreme Court has cited, and quoted from, the cases already mentioned. See *Steere v. Cupp,* 226 Kan. 566, 602 P.2d 1267 (1979); *Gleichenhaus v. Carlyle,* 226 Kan. 167, 597 P.2d 611 (1979). In *Steere,* an attorney's representation of a criminal defendant did not elevate him to public figure status. The court quoted language from *Gertz* noting Steere did not thrust himself into the vortex of a public issue, nor did he engage the public's attention in an attempt to influence its outcome. *Steere,* 226 Kan. at 574. Chief Justice Schroeder, in *Gleichenhaus,* referred to *Wolston* and *Proxmire* as narrowly defining a public figure. *Gleichenhaus,* 226 Kan. at 168.

If a public controversy had existed, John Hanrahan did not

voluntarily thrust himself into it to influence the outcome. The underlying reasons for not protecting public figures are not present. In *Steere,* 226 Kan. at 573, we said:

" 'First, we recognized that public figures are less vulnerable in injury from defamatory statements because of their ability to resort to effective "self-help." They usually enjoy significantly greater access than private individuals to channels of effective communication, which enable them through discussion to counter criticism and expose the falsehood and fallacies of defamatory statements. [Citation omitted.] Second, and more importantly, was a normative consideration that public figures are less deserving of protection than private persons because public figures, like public officials, have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." ' "

Appellees contend appellants stipulated they were public figures. From the record it is difficult to believe a stipulation or admission was made. The intent to agree is absent. The acceptance or offer of a stipulation was absent. A reliance on or acknowledgment of an admission is not present. Significantly, the trial court did not base its decision on the alleged stipulation, although the colloquy on which appellees rely was had before the trial court with the court participating. Although we find no stipulation or admission was made it is noted a court is not bound by agreements and admissions of the parties as to matters of law or legal conclusions. *State v. Young,* 228 Kan. 355, 614 P.2d 441 (1980). We do not feel so constrained by the language relied on.

The appellees argue a qualified privilege exists in Kansas apart from the qualified privilege set out in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323. The question of whether a qualified privilege exists is one of law. *Schulze v. Coykendall,* 218 Kan. 653. In the case of *Scarpelli v. Jones,* 229 Kan. 210, 216, 626 P.2d 785 (1981), we recognized this separate qualified privilege. Justice Herd wrote:

"In addition, we recognize a qualified privilege where a defamatory statement is 'made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, if it is made to a person with a corresponding interest or duty.' "

This privilege rests upon an interest or duty of the speaker and the listener. *Schulze v. Coykendall,* 218 Kan. 653, dealt with a school principal. The court found that patrons of the public schools had a common interest and duty. *Scarpelli* concerned officials and students at the University of Kansas Medical School. *Dobbyn v. Nelson,* 2 Kan. App. 2d 358, involved the running of the Kansas State University Library. *Senogles v. Security Benefit*

*Life Ins. Co.,* 217 Kan. 438, 536 P.2d 1358 (1975), was about transmittal of medical information by the defendant after the plaintiff had applied for life insurance with the defendant.

Neither Charles Horn nor his class had the type of interest required in the cases cited to create a qualified privilege. No school official overseeing the education of children in the community or internal workings of a university are involved here. The only interest the speaker or listener would have is curiosity in the investigation, not the interest or duty seemingly required by the cases. The trial court held the common interest privilege did not apply in this matter.

In *Beyl v. Capper Publications, Inc.,* 180 Kan. 525, 305 P.2d 817 (1957); *Stice v. Beacon Newspaper Corporation,* 185 Kan. 61, 340 P.2d 396 (1959); and *Gobin v. Globe Publishing Co.,* 216 Kan. 223, 531 P.2d 76 (1975), this court also recognized a qualified privilege for news publishers.

*Beyl, Stice* and *Gobin* do not support a qualified privilege under these facts. To hold that they did would diverge from the present United States Supreme Court thought and would require us to follow *Rosenbloom,* not *Gertz.* We agree with the trial court that the common interest privilege does not apply.

Did appellants have a claim for outrageous conduct? We agree with the trial court that they did not.

The tort of outrage has been recognized in Kansas. *Roberts v. Saylor,* 230 Kan. 289, 292, 637 P.2d 1175 (1981). In *Dawson v. Associates Financial Services Co.,* 215 Kan. 814, 820, 529 P.2d 104 (1974), we announced the Restatement of Torts (Second) test:

" 'One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.' "

A court must determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, the question is for the jury to determine. *Dawson,* 215 Kan. at 824. Past cases outline the tort in Kansas. In *Dawson* a creditor harassed a debtor knowing she was ill. The harassment worsened the debtor's condition. The court reversed a directed verdict which had been entered in favor of the defendant. In *Dotson v. McLaughlin,* 216 Kan. 201, 531

P.2d 1 (1975), a bank's taking over a business' affairs was not considered outrageous conduct. Calling the plaintiff a "bastard," a "nigger" and a "knot-headed boy" was not held to be outrageous conduct in *Bradshaw v. Swagerty,* 1 Kan. App. 2d 213, 563 P.2d 511 (1977). *Vespa v. Safety Fed. Savings & Loan Ass'n,* 219 Kan. 578, 549 P.2d 878 (1976), did not find sufficiently outrageous conduct in the activities of a bank vice-president. An employer's racial insults were held actionable in *Gomez v. Hug,* 7 Kan. App. 2d 603, 645 P.2d 916, *rev. denied* 231 Kan. 800 (1982). In *Roberts v. Saylor,* 230 Kan. 289, a doctor expressing his dislike to a person being prepared for surgery was not sufficiently outrageous. See also *Young v. Hecht,* 3 Kan. App. 2d 510, 597 P.2d 682 (1979). In *Hood v. Naeter Bros. Pub. Co.,* 562 S.W.2d 770 (Mo. App. 1978), publishing of a murder witness' name and address while the suspects were still at large was not outrageous conduct.

Charles Horn's statement was not beyond all possible bounds of decency. The statements in *Roberts v. Saylor,* 230 Kan. 289, seem more outrageous than those in this case and those statements were not actionable. Horn was told of the rumor by his wife. Telling his class of the rumor was improper, but not to the point of being utterly intolerable in a civilized community.

In *Roberts* we recognized a second threshold question to be determined by the court. "Was the emotional distress evidenced by plaintiff such that reasonable fact finders might differ as to whether it was genuine and so severe and extreme that no reasonable person should be expected to endure it?" 230 Kan. at 295. In his deposition, John Hanrahan stated he had suffered mental anguish, did not work much for four months after his son's death, and had to be operated on for a perforated ulcer. We agree John Hanrahan suffered severe emotional distress from his son's disappearance and death but that was not Charles Horn's doing. The question of what Charles Horn said and whether John Hanrahan was injured thereby will be tried in the slander case. Since we find the cause for outrageous conduct did not survive the first test, it is unnecessary to answer this second question.

Summary judgment on Carol Hanrahan's claims was correctly announced by the trial court and is affirmed. Slander actions generally must be brought by the slandered party. Prosser, Law of Torts § 111 (4th ed. 1971); 53 C.J.S., Libel and Slander § 145. The

trial court also correctly ruled that no cause exists against the Kansas Association of Realtors, Inc. Obviously Charles D. Horn was not speaking for it or with its approval when he spoke improperly of John Hanrahan.

We conclude that if in fact John Hanrahan has a cause of action it is for slander only and we remand for trial on that issue.

The trial court is affirmed as to all rulings on the motions for summary judgment except that on John Hanrahan's cause for slander. The judgment is reversed and the case is remanded for trial on that issue.