No. 58,822

MARY A. BURGESS, Individually and as Heir-at-Law of STEPHEN D. BLOOMER, deceased, *Appellant*, v. W. LANG PERDUE, II, M.D., and STATE OF KANSAS, *Appellees*.

(721 P.2d 239)

Opinion filed June 13, 1986.

*Rene M. Netherton*, of Law Offices of Jerry K. Levy, P.A., of Topeka, argued the cause and was on the brief for appellant.

*Marla J. Luckert*, of Goodell, Stratton, Edmonds & Palmer, of Topeka, argued the cause, and *Wayne T. Stratton*, of the same firm, was with her on the brief for appellee Perdue.

*Michael George*, of State Department of Social and Rehabilitation Services, argued the cause, and *Hal E. DesJardins*, of Topeka, and *David D. Plinsky*, assistant attorney general, were with him on the brief for appellee State of Kansas.

The opinion of the court was delivered by

LOCKETT, J.: The plaintiff appeals the decision of the Shawnee County District Court granting summary judgment to all remaining defendants prior to trial on the basis that (1) she did not state a cause of action of outrage against the State and (2) the cause of action of negligent infliction of emotional distress for

interference with a dead body, which she alleged against the defendant, W. Lang Perdue, II, is not recognized in this state.

Mary A. Burgess, the plaintiff, is the mother of Stephen D. Bloomer, deceased. Stephen was a resident of Kansas Neurological Institute (KNI) from June 1970, until his death on July 17, 1983. Dr. Camille Heeb was the treating physician for Stephen while he was a resident of KNI.

On July 17, 1983, Stephen was suffering from bilateral pneumonia. Dr. Heeb was out of town at a meeting, so Dr. W. Lang Perdue, II, was called to KNI to treat Stephen. Dr. Perdue attempted to place a subclavian catheter into Stephen's vein. Because the procedure was only partially successful, Stephen was taken to Stormont-Vail Regional Medical Center for emergency treatment. Stephen died of cardiac arrest while in transit to the hospital.

After Mrs. Burgess arrived at the hospital, Dr. Perdue advised her of Stephen's death. Mrs. Burgess informed the doctor that she did not want an autopsy performed on Stephen. Dr. Perdue then called the county coroner, Dr. Kiernan O'Callaghan, and described the circumstances of the death. Dr. O'Callaghan certified the death as a coroner's case pursuant to K.S.A. 19-1031 *et seq.* He stated that an autopsy would be required. Dr. Perdue then called Mrs. Burgess at her home. He informed her that an autopsy would be performed regardless of her granting permission. Though it was not necessary, Dr. Perdue asked for the mother's permission to perform the autopsy, mentioning that KNI would want to examine the brain. Mrs. Burgess agreed to a partial autopsy, but told Dr. Perdue that she neither wanted an autopsy done on her son's brain, nor would allow KNI to examine his brain.

Dr. Perdue failed to inform the county coroner that Mrs. Burgess had consented only to a limited autopsy. Instead, Dr. Perdue furnished to the county coroner a written authorization, as if approved by the mother, allowing a complete autopsy. The assistant county coroner performed a full autopsy on the body. Stephen's brain was removed and sent to KNI by the coroner.

Three weeks after Stephen's funeral, Dr. Heeb discovered the decedent's brain among the specimens received by KNI from the county coroner's office. Dr. Heeb then called Mrs. Burgess, informed her that KNI had her son's brain, and asked her what she would like to have done with it.

Later Stephen's body was exhumed and his brain buried with his body. The cost of having his body exhumed and reburied was $1,199.52.

On November 17, 1983, Mrs. Burgess filed a petition against Dr. Perdue and the State of Kansas. Plaintiff's petition sought damages (1) from the State of Kansas for the outrageous and negligent act of its employee, Dr. Heeb, in calling Mrs. Burgess, and (2) from Dr. Perdue for negligent infliction of emotional distress.

Both defendants filed motions for summary judgment. On September 20, 1985, the district court granted the State's motion, finding that Dr. Heeb's act of calling the plaintiff and informing her that KNI had her son's brain was not outrageous.

Later, the court granted defendant Perdue's motion, holding that a claim for negligent infliction of emotional distress for interference with a dead body will not lie against one who does not directly mishandle a decedent's remains.

Plaintiff appeals from both of the court's orders.

The plaintiff first contends that Dr. Heeb's act of telephoning her to tell her that KNI "had her son's brain in a jar" was outrageous conduct.

In *Dawson v. Associates Financial Services Co.*, 215 Kan. 814, 820, 529 P.2d 104 (1974), this court recognized the tort of outrage as stated in the Restatement (Second) of Torts § 46(1) (1963):

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

The tort of outrage was discussed at length in *Roberts v. Saylor*, 230 Kan. 289, 292-94, 637 P.2d 1175 (1981).

For intentional infliction of mental distress (outrage), proof of four elements is required to establish the cause of action: (1) the conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe.

Liability for extreme emotional distress has two threshold requirements which the court must first determine exist. The requirements are: (1) Whether the defendant's conduct may

reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff was of such an extreme degree that the law must intervene because the distress inflicted was so severe that no reasonable person should be expected to endure it. If the court determines from the pleadings, stipulations, admissions, and depositions of the parties that reasonable factfinders might differ as to whether defendant's conduct was sufficiently extreme and outrageous and the plaintiff's emotional distress was genuine and so severe and extreme that it caused injury, then it must be left to the jury to determine liability.

This court has failed to find outrageous conduct since the cause of action was recognized in *Dawson v. Associates Financial Services Co.*, 215 Kan. 814. Other Kansas cases discussing outrageous conduct include: *Hanrahan v. Horn*, 232 Kan. 531, 657 P.2d 561 (1983) (defendant told class that plaintiff was suspect in murder of plaintiff's son); *Hoard v. Shawnee Mission Medical Center*, 233 Kan. 267, 662 P.2d 1214 (1983) (plaintiffs were informed that their daughter was dead when she was actually at a different hospital); *Neufeldt v. L. R. Foy Constr. Co.*, 236 Kan. 664, 693 P.2d 1194 (1985) (woman who was recovering from miscarriage was falsely informed that an arrest warrant had been issued for her husband); *Chism v. University of Kansas Coll. of Health Sciences*, 237 Kan. 330, 699 P.2d 43 (1985) (a student was dismissed from medical school after repeated failure of courses).

Other courts have found that there is liability when an action exceeds all the bounds usually tolerated by a decent society, and it is of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind. Cases from other jurisdictions in which extreme outrage has been found include: *Savage v. Boies*, 77 Ariz. 355, 272 P.2d 349 (1954) (a woman suspected of insanity was decoyed to a hospital by a concocted tale of an injured husband and child); *Wilson v. Wilkins*, 181 Ark. 137, 25 S.W.2d 428 (1930) (a mob was brought to the plaintiff's door at night threatening to lynch him unless he left town); *Tea Company v. Roch*, 160 Md. 189, 153 A. 22 (1930) (the defendant wrapped a very gory dead rat inside of a loaf of bread and gave it to a person sensitive to such); *Wilkinson v. Downton*, 2 Q.B. 57 (1897) (a practical joker amused himself by telling a woman that

her husband had been smashed up in an accident and was lying with both legs broken, and that she was to go at once to "fetch" him home).

Here, however, the plaintiff is not suing the State for what happened to the body, but for the doctor's action in calling her to notify her that her son's brain was at KNI. While the statements made to the mother were probably shocking, they were not outrageous—"so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." The doctor called the mother because she knew the mother had not wanted the brain autopsied. The doctor was concerned that any impropriety be resolved. She did not intend to harass or intimidate or otherwise abuse the mother. No malice was involved.

While the wording the doctor used in informing the mother of the problem was probably not the most tactful, the doctor's conduct was not outrageous. The trial court correctly determined that the doctor's action was not so extreme and outrageous as to subject the State to liability for her action.

Burgess' second contention is that Perdue's negligence caused her to suffer emotional distress when she learned that her son's brain had been removed despite her request for a limited autopsy. The court found that Burgess had suffered no bodily injury caused by Perdue's negligence. Since her claim was based on the simple negligence of the doctor's failure to relay her wishes regarding the autopsy to the coroner, as a matter of law, the plaintiff could not recover for negligent infliction of emotional distress.

Burgess argues that physical injury is not necessary for negligent infliction of emotional distress when a relative suffers emotional harm resulting from the negligent mishandling of a corpse. She claims that Dr. Perdue interfered with her right of possession of the corpse and thus caused her to suffer extreme emotional distress. Dr. Perdue argues that he could be liable for negligent infliction of emotional distress only if he personally mishandled the corpse.

The district court, when granting summary judgment, reasoned that the Restatement (Second) of Torts § 868 (1977) "extend[s] liability to those who come in direct contact with the dead body," and that "the reluctance on the part of the Kansas

Supreme Court to allow recovery for negligent infliction of emotional distress absent physical harm was apparent." This reluctance compelled the court to narrowly construe the exception to the general rule. Since Dr. Perdue had not actually performed the autopsy, he was not responsible for causing the mother's emotional distress.

The Restatement (Second) of Torts § 868 recognizes a tort for interference with dead bodies:

"One who intentionally, recklessly or negligently removes, withholds, mutilates or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body."

Comment *a* to § 868 states:

"One who is entitled to the disposition of the body of a deceased person has a cause of action in tort against one who intentionally, recklessly or negligently mistreats or improperly deals with the body, or prevents its proper burial or cremation. The technical basis of the cause of action is the interference with the exclusive right of control of the body, which frequently has been called by the courts a 'property' or a 'quasi-property' right. This does not, however, fit very well into the category of property, since the body ordinarily cannot be sold or transferred, has no utility and can be used only for the one purpose of interment or cremation. In practice the technical right has served as a mere peg upon which to hang damages for the mental distress inflicted upon the survivor; and in reality the cause of action has been exclusively one for the mental distress. The rule stated in this Section has thus a great deal in common with the rules stated in §§ 46, 312 and 313. There is no need to show physical consequences of the mental distress."

Cases in other jurisdictions have allowed suits for interference with dead bodies against other persons or agencies than those who actually performed the autopsy or in some other way directly interfered with the body. For example: *Darcy v. Presbyterian Hospital*, 202 N.Y. 259, 95 N.E. 695 (1911) (after the mother of a deceased had expressly refused permission to perform an autopsy on the body of her son, the defendant hospital had the city coroner send a physician to perform the autopsy); *French v. Ochsner Clinic*, 200 So. 2d 371 (La. App. 1967) (after her husband died of terminal lung cancer while in the hospital, the widow refused to consent to an autopsy. The defendant hospital was found liable for performing an unauthorized autopsy on the body of the decedent); *Torres v. State of New York*, 34 Misc. 2d 488, 228 N.Y.S.2d 1005 (1962) (the plaintiff had not known of her husband's death in a state hospital and had given

no consent to an autopsy. The state was liable for an unauthorized autopsy performed by the state hospital because the hospital's attempts to contact the plaintiff were not reasonable and sufficient); *Aetna Life Insurance Co. v. Burton,* 104 Ind. App. 576, 12 N.E.2d 360 (1938) (the defendant insurance company unlawfully caused an unauthorized autopsy to be performed). For other cases where various hospitals, insurance companies, colleges and individuals have been sued for performing wrongful autopsies, see Annot., 18 A.L.R.4th 858.

Kansas has recognized a cause of action for negligent infliction of emotional distress when actual physical injury is involved. In two cases, a limited exception to the rule requiring physical injury was recognized where there had been intentional mishandling of a corpse.

In *Alderman v. Ford,* 146 Kan. 698, 72 P.2d 981 (1937), this court determined that the wife of a deceased man has a right to possession of the dead body of her husband in the same condition it was when he died. It also determined that an autopsy unauthorized by the widow is an invasion of the right of the widow to possession of the body, and that the widow may maintain an action for mental pain and suffering as a result of the unauthorized autopsy on the body of her husband, even though she suffered no physical injury.

This right was also recognized in *Hamilton v. Individual Mausoleum Co.,* 149 Kan. 216, 86 P.2d 501 (1939). There the children of a family decided to move a vault containing their mother's remains from one lot to another. Employees of the defendant, when excavating the vault, discovered that water had entered the vault. Without the children's permission, the employees raised the old vault, removed the casket and placed it in a new vault. The court determined that any of the five children in the family had a right of action for wrongful disturbance and removal of the body.

In *Alderman,* the widow was suing the surgeon and his assistant who performed an unlawful autopsy on the body of her husband without her permission. The court specifically found that the right of recovery by the widow did not depend on negligence, but on her legal right to receive the body of her late husband in the condition as when he died. In *Hamilton,* the children did not allege negligence but sued the mausoleum

company and its employees for the willful, wrongful and malicious act of disturbing the body.

In the present case, the coroner removed the decedent's brain after Dr. Perdue had incorrectly informed him that the plaintiff had consented to a full autopsy. Dr. Perdue, in seeking authority to perform the autopsy, assumed a duty of care toward the plaintiff which he violated by not relaying the plaintiff's consent to only a limited autopsy. Dr. Perdue misled the plaintiff and prevented her from taking any action to prevent a full autopsy. While Dr. Perdue did not perform the actual autopsy, his negligence in failing to notify the coroner of the mother's request placed him in such a position that the coroner acted under his authority.

The trial court's reasoning that only those individuals who "directly mishandle" the body are liable is too narrow. Obviously, hospitals, insurance companies and medical schools in the previously stated cases could not directly perform an unauthorized autopsy. They did, however, in some manner authorize a coroner or physician to perform the autopsy. The question is, are we going to adopt the new position of the Restatement (Second) of Torts § 868 (1977), which states, "One who intentionally, recklessly or negligently removes, withholds, mutilates or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability"? The prior edition of the Restatement created liability only where there was intentional or wanton interference with the body. Restatement of Torts § 868 (1939).

The new position was first proposed by the writers in a 1970 tentative draft, but it was not until 1977 that this became the official position of that text. The present Restatement position represents the minority view. See 48 A.L.R.3d 261, 265.

The majority rule holds that, for an individual to be liable for emotional distress for interfering with a dead body, the act must be intentional or malicious, as opposed to negligent, interference with the plaintiff's right to the body and that interference must be the proximate cause of the mental anguish and/or physical illness of the plaintiff. *Alderman* and *Hamilton*, which establish the Kansas right of action for the mishandling of corpses, involved conduct other than negligence. Both Kansas cases follow the majority rule of liability for interference with a dead body.

The district court properly granted Perdue's motion for summary judgment.

The district court further found that while Dr. Perdue did not owe a duty to the plaintiff to obtain her consent to an autopsy, the defendant, "in seeking consent, where none was required," voluntarily assumed a duty to relay the limitation. The court said that "where performance clearly has begun, there is no doubt that there is a duty of care." See Restatement (Second) of Torts § 323 (1963), which states that one who undertakes, gratuitously or for consideration, to render services to another is subject to liability if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Prosser and Keeton on Torts § 56, pp. 381-82, (5th ed. 1984), discusses the liability of one who assumes a duty and by his failure to perform as promised has made the situation worse.

"In most of the cases finding liability, the defendant has made the situation worse, either by increasing the danger, by misleading the plaintiff into the belief that it has been removed, or by depriving him of the possibility of help from other sources. Many of the decisions state that some such element is necessary, and that there can be no liability where the conduct in no way aggravates the situation or misleads the plaintiff, and he is left no worse off than he was before. There are however, a number of cases, most involving gratuitous repairs by landlords, in which any such requirement has been rejected, and the defendant has been held to the obligation of reasonable care in his undertaking, although the plaintiff has not been more endangered, misled, or deprived of other help."

The district court found that Dr. Perdue had voluntarily assumed a duty to relay the information to the coroner but had failed to carry out his promise and was therefore responsible for the reasonable cost of exhuming and reburying the body. The court entered judgment for the plaintiff in the amount of $1,199.52 and court costs.

In the present case, Mrs. Burgess was misled as to the status of the autopsy. She could have acted on her own to prevent the brain autopsy had she not believed Dr. Perdue had taken care of the matter. While Dr. Perdue did not directly handle the body during the autopsy, he, at least, provided apparent authority for the coroner to proceed with a full autopsy. Though Dr. Perdue received no monetary or other type of benefit from the performance of the autopsy, he did take on the responsibility to relay the mother's request for a partial autopsy to the coroner.

The trial court correctly reasoned that Dr. Perdue created the situation which resulted in the alleged injury. The doctor assumed a duty which he was not required to assume. He did not follow through. Once performance was begun, Dr. Perdue owed a duty of care toward the plaintiff.

The judgment is affirmed.

PRAGER, J., not participating.