No. 57,441

OLIVER REDMOND, *Appellant,* v. THE SUN PUBLISHING CO., INC., and CLYDE M. REED, individually and as Editor and Publisher of THE PARSONS SUN, *Appellees.*

(716 P.2d 168)

Opinion filed March 28, 1986.

*James S. Phillips, Jr.,* of Phillips & Phillips, Chartered, of Wichita, argued the cause and *James S. Phillips, Sr.,* of the same firm, was with him on the brief for appellant.

*Richard C. Dearth,* of Jones, Markham, Dearth, Markham & Johnson, Chartered, of Parsons, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

LOCKETT, J.: Oliver Redmond contends that the defendants libeled him in a newspaper article printed in April of 1979. The Labette County District Court granted the defendants' motion for summary judgment finding that the statements in the article were either substantially true or non-defamatory opinions and if the statements were not true, Redmond had failed to show special damages. Redmond appeals.

Oliver Redmond was employed by the Parsons Police Department from July 1, 1947, until April 15, 1973, during which time he reached the rank of patrolman. After 26 years of service, Redmond retired from the police department. He now has other employment.

For approximately 14 years Redmond was treasurer of the First Credit Union of Parsons, Kansas, which had its offices in Redmond's home. In 1969, the credit union was declared insolvent by the Kansas Credit Union Administrator.

During 1977, Redmond participated in an unsuccessful attempt to recall the Parsons city commissioners. He attended organizational meetings for the recall and circulated petitions in support of the recall. In 1978, a second attempt to recall city commissioners failed. Redmond, who was again involved in the effort, obtained more signatures on petitions than any other person involved.

After placing fourth in the primary, Redmond was a candidate for city commission in the general election held in Parsons, Kansas, on April 3, 1979. He finished last in the four-man race for the commission. On April 4, 1979, The Parsons Sun published the following account of Redmond's defeat in a front page article written by Clyde Reed, the Sun's editor and publisher.

"Past Catches Up With Oliver Redmond
in City Election
By OBSERVER

"Parsons hadn't seen anything quite like it, the frantic campaign by Oliver Redmond for a seat on the city commission.

"It was a strongman act designed to topple city government, if not now then by gaining a foothold which would eventually bring about that result. With, of course, Redmond the top dog.

"It all was in vain. Redmond finished fourth again Tuesday as he had in the primary and didn't manage to carry a single precinct. Not only that. He finished fourth in all precincts, including the 2nd of the 3rd Ward where much of the city's black vote is concentrated.

"Redmond had put much emphasis on absentee votes, obtained from nursing homes and the sick and elderly and others.

"But the extra fruits of that effort were rather slim.

"Redmond had 336 absentee votes in the March primary and added only 112 Tuesday for a 448 total. He did more than double his regular vote harvest. It was a meager 207 in the primary and 439 Tuesday. Other candidates Tuesday got 3 or 4 times more regular votes.

"Robert Trusdale, the top candidate, polled 92 absentee votes and Robert J. Bartelli, who finished second, had 62.

"Redmond operatives arrived at the county election office in Oswego about 6:45 p.m. Tuesday, 15 minutes before the polls closed, with his absentee votes unceremoniously carried in two grocery sacks.

"While Redmond based his campaign on a direct challenge of city . . . policies in recent years, including tax rates, silent factors cut deeply against him.

"His role in the 1969 collapse of a credit union which he managed was in the minds of many persons and became a lively conversation topic. This was especially true among those whose savings were jeopardized in the incident.

"Redmond's years in the Parsons Police Department, too, were discussed freely in law enforcement circles and among others. He was viewed as a discordant element in the department before retirement and there was a feeling of relief among law officers as well as public officials when he retired.

"Redmond in more recent years was a leader and prime mover in two ill-fated recall actions in Parsons. He circulated many petitions to bring about an election for removal of city commissioners.

"The first move failed because the state attorney general ruled that the petitions were faulty. The second was knocked out in district court because one of the sponsors listed an incorrect address of his residence.

"While attention was given to the similarity of many signatures on the

petitions, they were challenged on other reasons. If those routes hadn't been followed, it is likely many of the signatures on first petitions would have been challenged on the grounds that they were improper.

"In the end, the threat Redmond attempted to mount to the tune of 'Onward Christian Soldiers' and various patriotic songs as background music to his radio commercials utterly failed. It was abundantly clear that he couldn't live down his past."

Based on the publication of the article, Redmond filed a libel action against Reed and The Parsons Sun. The defendants filed their motion for summary judgment and a memorandum which contained 58 uncontroverted facts. The district court adopted the defendant's uncontroverted facts and granted summary judgment to the defendants, finding that: (1) the statements in the article were either substantially true or non-defamatory opinions and that (2) even if the statements were not true, Redmond had failed to show special damages.

It is well recognized that publications concerning a public official or a public figure are qualifiedly privileged and are actionable only if malice can be shown.

In *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964), the court held that the federal constitutional guaranties of freedom of speech and press prohibit a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice," that is, with knowledge that it was false or with reckless disregard of whether it was false or not. The *New York Times* rule has been held to apply to candidates for public office, because their private character or reputation and their skill and integrity are important public matters.

Prior to the *New York Times* case, this court recognized that published discussions of a candidate's qualifications are conditionally privileged. The public benefit from publicity is so great, and the chance of injury to private character so small, that such discussions must be privileged. *Coleman v. MacLennan*, 78 Kan. 711, 98 Pac. 281 (1908). To defeat the qualified privilege there must be a showing of malice—actual evil-mindedness is necessary. Under the First Amendment's guaranty of freedom of speech, the burden of proving malice is placed on the one claiming that his reputation was injured, and no presumptions are to be allowed.

In the present case, the plaintiff had been a candidate for public office. Was the district court correct in determining that the plaintiff was a public figure and that he had to prove malice on the part of the newspaper before he could establish that he had been libeled?

Redmond argues that, following the election, he was not a public figure. The defendants claim that because of Redmond's candidacy, his involvement in various public controversies and his position in the police department, he was a public figure. We agree.

There are two types of public figures:

(1) *All-Purpose Public Figures*—those persons who occupy positions in society (not only in government) of "persuasive power and influence" or achieve pervasive fame and notoriety.

(2) *Limited-Purpose Public Figures*—those who have " 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.' " *Steere v. Cupp*, 226 Kan. 566, 572, 602 P.2d 1267 (1979).

The public figure, like public officials, are individuals who voluntarily expose themselves to be the subject of numerous and varied communications. Both public officials and public figures have better access to the media and other channels of communication than a private individual and can readily respond to communications attacking their character. They are perceived as having less need for protection from communications.

This court considered the issue of who was a "public figure" in *Hanrahan v. Horn,* 232 Kan. 531, 657 P.2d 561 (1983), and found that the question of whether there is a qualified privilege based on the status of the individual claiming he was defamed is one of law. It said that *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), had altered the public interest standard which now focused on the nature and extent of an individual's participation in the particular controversy giving rise to the defamation. 232 Kan. at 534.

Generally, police officers who hold some authority within the department have been considered public figures. *Suchomel v. Suburban Life Newspapers, Inc.*, 84 Ill. App. 2d 239, 228 N.E.2d 172 (1967) (a sergeant who was second in command); *Thompson v. St. Amant,* 184 So. 2d 314 (La. App. 1966) (a parish police captain and a deputy sheriff); *Gilligan v. King*, 48 Misc. 2d 212,

264 N.Y.S.2d 309 (1965) (a police lieutenant). Patrolmen, however, have usually been found not to be public figures within the meaning of the *New York Times* rule. *Coursey v. Greater Niles Tp. Pub. Corp.,* 82 Ill. App. 2d 76, 227 N.E.2d 164 (1967); *Tucker v. Kilgore,* 388 S.W.2d 112 (Ky. 1964). This court, however, in *Rawlins v. Hutchinson Publishing Co.,* 218 Kan. 295, 543 P.2d 988 (1975), held that a policeman with no special position in the police department was a public figure because of the policeman's unique position in society of having the responsibility of enforcing laws. A police officer assumes a public role by becoming a public official and thereby waives his right of privacy as to any conduct which bears on his fitness for that office.

Under a democratic form of government like ours, there must be freedom to evaluate the character and qualifications of candidates for office, whether elective or appointive. When one chooses to become a candidate, or allows his name to be submitted for an appointive position, the individual submits for evaluation his honesty, integrity, and fitness for the office he seeks to fill. Candidates for public office have been held to be public figures in *Ocala Star-Banner Co. v. Damron,* 401 U.S. 295, 28 L. Ed. 2d 57, 91 S. Ct. 628 (1971) (involving a city mayor who was a candidate for county tax assessor); *Beckley Newspapers v. Hanks,* 389 U.S. 81, 19 L. Ed. 2d 248, 88 S. Ct. 197 (1967) (involving an incumbent candidate for court clerk); *Treutler v. Meredith Corporation,* 455 F.2d 255 (8th Cir. 1972); *Pauling v. News Syndicate Company,* 335 F.2d 659 (2d Cir. 1964), *cert. denied* 379 U.S. 968 (1965); *Goldwater v. Ginzburg,* 261 F. Supp. 784 (S.D.N.Y. 1966). This rule was also cited in *Hein v. Lacy,* 228 Kan. 249, 258, 616 P.2d 277 (1980), which dealt with defamation of an incumbent during a campaign for re-election.

Redmond contends that since the election was over, he was no longer a candidate for public office, and therefore, he was no longer a public figure. He argues that after an election, unsuccessful candidates for public office have ceased to voluntarily expose themselves to be the subject of communications regarding their candidacy.

The fact that the person defamed is a former public official does not of itself return the individual to the status of a "private individual." The protection of the rule of the *New York Times* case, where the former official position was one which would

invite public scrutiny and discussion of the person holding it, may still be in effect. In *Rosenblatt v. Baer*, 383 U.S. 75, 15 L. Ed. 2d 597, 86 S. Ct. 669 (1966), an action brought by a former supervisor of a county recreation area, the court said that the fact that he had recently been discharged and was no longer employed at the time the defamatory article was published had no "decisional significance," where the management of the area was still a matter of public interest at the time of the allegedly libelous statement.

The plaintiff cites *Ott v. Murphy*, 160 Iowa 730, 141 N.W. 463 (1913), in which the court held that a newspaper had improperly commented on Ott's conduct in an unsuccessful campaign for public office. In that case, however, the newspaper article appeared nearly two years after the campaign, and the case was decided in 1913, prior to the more recent decisions of the United States Supreme Court.

In *Rawlins v. Hutchinson Publishing Co.*, 218 Kan. 295, the court found that a lapse of time of nearly ten years between when the plaintiff was a "public figure" and the publishing of an article concerning the events of that period did not make the publishing of the article libelous. The court rejected the test of "current newsworthiness," requiring a case-by-case evaluation of the current public interest. Such a test would impose an intolerable burden on the press to publish at the peril of having its news judgment later declared faulty in an action for damages.

Here, the article regarding Redmond's defeat at the polls appeared the day after the election. The facts at the time were of public concern. Once these facts entered the public domain, they remained there and subjected Redmond to comments as a public figure.

We find that when Redmond became a candidate for public office, he was a public figure for all purposes. Redmond's defeat for political office was of public concern when the article was printed. If we were to adopt Redmond's claim that one day after his unsuccessful bid for public office he was no longer a public figure, such would preclude all comments about unsuccessful candidates after the election was determined.

We must also resolve the status of the defendants who published the statement to determine whether they have an absolute

privilege, a limited privilege or no privilege from the imposition of damages.

(1) Absolute privilege is granted to those in a legislative, executive or judicial capacity by constitution, legislative enactment or by law as determined by the courts.

(2) A limited privilege is granted to those with a special interest or a duty in the subject matter of the communication.

A newspaper has limited immunity. In *New York Times Co. v. Sullivan,* 376 U.S. 254, the court held that the federal constitutional guaranties of freedom of speech and press confer a limited privilege upon a newspaper, which prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice," that is, with knowledge that it was false or with reckless disregard of whether it was false or not. The *New York Times* rule has been held to apply to candidates for public office, because their private character, reputation, skill and integrity are important public matters.

In the present case, the plaintiff was a candidate for public office. The newspaper and the author of the article were afforded a limited or qualified privilege. The district court was correct in determining that Redmond was a public figure and that he had to prove actual malice on the part of the newspaper before he could establish that he had been libeled.

Redmond argues that he was entitled to a jury trial on the issue of malice. The existence of malice is ordinarily a question of fact for the jury, but where the facts are not in dispute, it is a question of law for the court. From the evidence obtained through discovery, the district court determined that the statements made in the newspaper article about Redmond concerning his participation in the credit union, his years on the police force, and his involvement in the recall elections were substantially true. As noted in *Steere v. Cupp,* 226 Kan. 566, where the statements are substantially true, there is no malice, and where there is no malice, a public figure cannot be libeled.

Redmond contends that summary judgment was improper in this case because there were issues of fact concerning Redmond's involvement in the collapse of the credit union, his involvement in the recall movement and his role in the police department. It has been recognized that summary judgment should be employed with caution in a defamation case when the

evidence shows no liability as a matter of law and where the essential facts are not in dispute. *Hein v. Lacy*, 228 Kan. 249. However, summary judgment may properly be granted where the essential facts are not in dispute and the evidence shows no liability as a matter of law. *Steere v. Cupp*, 226 Kan. 566.

In his deposition, Redmond honestly admitted that neither he nor his wife were able to give the name of an individual who thought less of Redmond or ridiculed him because of the article. Redmond stated that he had suffered no financial loss due to the publication by the defendants. Prior to his granting summary judgment, the judge reviewed the memorandum containing the 58 uncontested facts and each paragraph of the article that appeared in the newspaper and determined that there was no genuine issue of material fact. Based upon this finding, the judge found that the statements were either substantially true or non-defamatory opinions.

From the undisputed factual background, the district court correctly determined that the statements made in the newspaper article were substantially true. This case does not present factual circumstances which would allow a cause of action. The district court did not err in granting summary judgment for the defendants. For there to be liability for defamation, there must be a publication of matter that is both defamatory and false. Where the published statements are substantially true, there is no liability.

The judgment of the district court is affirmed.