NOT DESIGNATED FOR PUBLICATION

Nos. 127,024
127,025

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MERRY GUMM and AMY GUMM,
*Appellants*,

v.

MARY DIXON and DEBBIE MILLER,
*Appellees*.

MEMORANDUM OPINION

Appeal from Cowley District Court; LADONNA L. LANNING, judge. Oral argument held March 11, 2025. Opinion filed April 18, 2025. Affirmed.

*Jerry D. Bogle*, of Young, Bogle, Wells & Blanchard, P.A., of Wichita, for appellants.

*J. Eric Weslander*, of Stevens & Brand, LLP, of Lawrence, for appellees.

Before ISHERWOOD, P.J., BRUNS and GARDNER, JJ.

PER CURIAM:  Merry and Amy Gumm appeal from the district court's order striking the claims they asserted against Mary Dixon and Debbie Miller. The district court struck their claims under the Kansas Public Speech Protection Act (KPSPA), K.S.A. 2023 Supp. 60-5320. On appeal, the Gumms challenge the district court's striking of their claim for libel. Based on our review of the record, we find that the Gumms failed to establish a likelihood of prevailing on their libel claim by presenting substantial competent evidence to support a prima facie case. Likewise, we do not find that the district court abused its discretion in awarding attorney fees. Thus, we affirm.

1

*The Dog Breeding Operation*

Merry and Amy Gumm breed and sell border collies. They operate their retail dog breeding operation in Douglass using several different business names. Since 2011, Merry Gumm has bred and sold border collies under the tradename Nightshades Border Collies. Her sister, Amy Gumm, has bred and sold border collies for a similar period of time under the tradename Firestorm and Feel the Force Border Collies. Although they operate their businesses under different names, the Gumms share facilities, and they both market border collies from the same bloodlines.

Under the name Nightshades Border Collies, the Gumms maintained a website, which was linked to Twitter, Facebook, and Google Plus. The website included approximately 25 reviews from purported customers. The website also featured an "In the News" section that described various accomplishments by border collies sold by Nightshades. Similarly, under the name Firestorm Border Collies, the Gumms maintained a website advertising "Quality pups from quality parents."

In addition, Nightshades Border Collies operated a YouTube channel to market the dogs. As of March 2023, the YouTube channel had more than 41,170 views. Furthermore, the Gumms marketed their border collies on Puppies.com—with more than 30 puppies offered for sale as of March 2023. Likewise, Amy Gumm was the administrator of a Facebook group—called "Nightshades Border Collies Puppy Owners, ETC"—which had more than 1,073 members as of March 2023.

*The Life of Toby*

On June 13, 2015, Mary Dixon—who lives in Olathe—purchased a border collie puppy from the Gumms that was on consignment for Ray Hanes. Although the border collie was not bred by the Gumms, it is unclear from the record how the puppy was related to the puppies they sold. Even so, the American Kennel Club certificate for the dog—who Dixon named Toby—listed Hanes as the breeder. Unfortunately, when Toby was about 2 1/2 years old, he began suffering from seizures, and a veterinarian diagnosed him with epilepsy. Eventually, Toby had to be put to sleep when he was only four years old due to his health issues.

After Toby's seizures began, Dixon asked the Gumms questions about Toby's litter. Merry Gumm informed Dixon that the parents of the dog were owned by a third party, stating: "We sold this litter for an acquaintance who had lost his house, couldn't keep the mama and puppies, and had no one that would keep them." When Dixon contacted Hanes by email, he claimed he had "leased" the dogs to the Gumms. In an email sent on or about January 3, 2018, Dixon indicated that she understood that Toby was not from the Nightshades' bloodlines.

Still, when Dixon submitted a complaint to the Better Business Bureau (BBB) about the transaction, Merry Gumm responded: "If Mrs. Dixon is saying that her puppy does not come from Nightshades lineage, she is incorrect. MS. DIXON'S PUPPY DOES COME FROM SOME OF NIGHTSHADES' LINES." She then explained that there is an overlapping lineage between Toby and the border collie puppies bred by Nightshades. She concluded her response by stating: "With respect to lineage and care provided the puppy, Mrs. Dixon does have a Nightshades puppy."

*The Federal and State Inspections*

On May 10, 2018, the United States Department of Agriculture (USDA) inspected the Gumms' dog breeding operation. The USDA reported that it found that there were 155 dogs—69 adult dogs and 86 puppies—at the facility. It also reported that there were weaned puppies from separate litters being housed together, that several adult dogs did not have official identification tags, and that there was "an accumulation of feces in at least three of the outdoor enclosures." The USDA report explained that the feces could "attract insects/pests, contribute to odors, soil the animals, and can facilitate the spread of disease." Moreover, the USDA report noted dirty food and water receptacles—as well as bird nests and bird droppings in the dog shelters—that can also transmit disease.

The USDA conducted another inspection of the Gumms' dog breeding operation on March 26, 2019. During the inspection, the USDA found 83 dogs—35 adult dogs and 48 puppies—at the facility. The USDA reported that it found "an excessive amount of excreta on the floor in the large shelter housing 4 weaned puppies" and that this could "increase disease transmission as well as soil the puppies." It appears that Merry Gumm did not renew or withdrew her USDA breeders' license in the Spring of 2021.

On August 4, 2021, the Kansas Department of Agriculture (KDA) inspected the Gumms' dog breeding facility. The KDA found 139 dogs—71 adult dogs and 68 puppies—on the premises. In its report, the KDA noted violations of animal-care regulations. These violations included surfaces with jagged edges that had been chewed up as well as a buildup of cobwebs and dirt in puppy pens.

The KDA conducted another inspection of the Gumms' dog breeding operation on January 5, 2022. At the time there were 126 dogs—73 adult dogs and 53 puppies—at the facility. As a result of the inspection, the KDA gave the facility an "Unsatisfactory rating" and noted that it had substantiated a complaint about the poor conditions for dogs.

The complaint had noted frozen water dishes, holes from digging, and a buildup of feces in the whelping building. The complaint also mentioned a "thin and ill" dog that was coughing and had green matter in both eyes.

The 2022 edition of the Humane Society of the United States listed the Gumms—operating under the names of Nightshades and Firestorm Border Collies—as part of its "Horrible Hundred." The publication provides an "annual overview of problem puppy mills and puppy sellers in the United States." The Humane Society described in the publication that state inspectors had "rated the kennel unsatisfactory due to excessive piles of feces, 'a build up of cob webs, dust and dirt,' an expired veterinary care form, and some areas of disrepair. The kennel was charged a $200 reinspection fee and was warned that additional civil penalties or remedies may be sought." The Humane Society's publication was subsequently covered by local news outlets in the Wichita area.

*The Social Media Posts*

After making posts describing Toby's health issues, Dixon was kicked out of the Facebook group administered by Amy Gumm. Afterward, Dixon started her own Facebook group, which she called "Real Nightshades BC Owners." On the new group's page, Dixon posted various comments about the Gumms' dog breeding operation. In addition, she reposted some comments made by Debbie Miller—who is a Sedgwick County resident and maintains a Facebook page titled Kansas Companion Animal Protection Society (KS-CAPS)—about the Gumms' businesses.

Miller is a volunteer with KS-CAPS and frequently uses her Facebook page to post messages advocating for animal welfare. KS-CAPS is affiliated with a national non-profit organization—known as the Companion Animal Protection Society (CAPS)—that encourages people to "stand together against . . . puppy mills." On her Facebook page, Miller encouraged readers to contact government agencies to advocate for improved

conditions for animals. She also posted about several complaints that had been received from around the United States about puppies purchased from the Gumms.

On February 1, 2022—in response to a person who had posted on Facebook about health issues suffered by a puppy purchased from the Gumms—Dixon stated: "I hate the Gumms and what their bad choices do to families who buy their dogs." A few weeks later, Dixon posted that the Gumms breed "pretty colored dogs. But [they breed] LOTS AND LOTS of dogs." About a month later, Dixon posted: "I had to put my Toby down at 4 years old because of his epilepsy. Full disclosure—Amy [Gumm] is well aware she has epilepsy in her lines."

On April 21, 2022, Miller asked Dixon's Facebook group whether anyone else had complaints about Nightshades. Miller also encouraged those who had problems with the Gumms' dog breeding operation to "please submit a complaint to KDA" and provided a link. She also emphasized the importance of providing proof—such as "vet records"—to the KDA in support of any complaints that were filed. Specifically, Miller stated that "[i]t's ESPECIALLY important to provide proof of epilepsy history that we all know exists."

On May 24, 2022, Miller again inquired about people who have had a bad experience with the Gumms' dog breeding operation and asked them to share their experiences as well as to file a complaint with the KDA. The same day, Dixon posted: "To everyone that has had a bad experience with Nightshades, Prairie Wind, Firestorm, whatever the next new name will be . . . I am asking you to please consider reaching out to Kansas Dept of Agriculture."

On October 8, 2022, Dixon posted on her Facebook page her belief that even though the Gumms know they have epilepsy in the bloodlines of the puppies they sold, "they won't stop." On the same day, Dixon posted that Merry Gumm had sent a message

6

threatening to sue her for defamation if she did not shut her Facebook page down. Dixon indicated that she would not shut the page down and expressed her desire to do even more to help.

A few days later, on October 11, 2022, Dixon reposted a post by Miller on her Facebook page. Miller's post stated that "Nightshades Border Collies (aka) Firestorm owned by Amy Gumm/Merry Gumm is a PUPPY MILL located in Butler County, Kansas." The post went on to talk about the KDA inspection conducted earlier in the year as well as the fact that the Gumms' dog breeding operation had been "added to the Humane Society's Horrible Hundred list." On a "Puppy Mill FAQ" page on Miller's CAPS website, puppy mill is defined as "a commercial breeding kennel that mass-produces dogs in usually cramped, crude, filthy conditions for resale."

*The Lawsuit*

On January 26, 2023, the Gumms filed a petition against Dixon, Miller, and Julie Fuller. In their petition, the Gumms requested injunctive relief—requesting that Dixon and Miller take down their Facebook posts. In addition, the Gumms sought to recover damages for tortious interference with a prospective business advantage, "business defamation," and libel.

In response, defense counsel sent a letter to the Gumms' attorney, which stated:

"I am writing to urge that you withdraw the petition against my client, given that your petition is likely to be stricken under the provisions of the Kansas Public Speech Protection Act (PSPA), K.S.A. 60-5320. Specifically, my clients' alleged conduct, and apparently that of the other defendants in this case, consists of speech on matters of public concern, i.e., the conditions in which your clients keep animals, your clients' licensing status, the results of governmental investigations, and ethical/societal issues associated with for-profit sale of companion animals. Should this matter proceed to a

7

Motion to Strike, my client will easily demonstrate that this matter falls within the ambit of the PSPA."

In the letter, defense counsel also explained that the request for a voluntary dismissal by the Gumms was intended to avoid the time and expense of moving to strike. Additionally, defense counsel offered that in exchange for a dismissal of the claims with prejudice, his clients would not request attorney fees under the KPSPA, K.S.A. 2023 Supp. 60-5320. Although the Gumms agreed to voluntarily dismiss Fuller as a defendant, they rejected the proposal to also voluntarily dismiss Dixon and Miller.

On March 24, 2023, Miller moved to strike the Gumms' claims under the KPSPA. A few weeks later, Dixon also moved to strike under the KPSPA. In support of their respective motions, Dixon and Miller both filed declarations under K.S.A. 2023 Supp. 53-601 to which they attached multiple exhibits. In turn, the Gumms jointly responded to both of the motions to strike. Merry Gumm submitted a declaration with the response— which attached various exhibits—and she filed a second declaration the next day that included additional exhibits. Although Amy Gumm did not initially submit a declaration or affidavit in response to the motions to strike, she later did so after Dixon and Miller filed a consolidated reply.

The district court heard the motions on June 22, 2023. After taking the matter under advisement, the district court held a Zoom hearing on July 18, 2023. During the hearing, the district court announced that it was granting the motions to strike under the provisions of the KPSPA. Later, on August 14, 2023, the district court entered a journal entry explaining its decision.

In the journal entry, the district court determined that Dixon and Miller had met their initial burden of establishing a prima facie case that their conduct fell within the provisions of the KPSPA. In particular, the district court found that the claims asserted by

the Gumms in their petition concern the exercise of free speech, the right of association, and the right to petition the government. As a result, the district court found that the burden shifted to the Gumms to demonstrate a likelihood of prevailing on their claims asserted against Dixon and Miller by presenting substantial competent evidence to support a prima facie case.

Next, the district court found—based on its review of the evidence and the arguments presented by counsel—that the Gumms had failed to come forward with substantial competent evidence to support their claims. Material to the issues presented in this appeal, the district court determined that the Gumms had failed to come forward with evidence that either met the elements of libel or were not barred by the statute of limitations. As to the statements not barred by the statute of limitations, the district court found the Gumms had failed to provide legal or factual support to show that the statements made by Dixon and Miller were not true nor had they shown the element of actual malice.

As the district court explained:

> "The statements of which Plaintiffs apparently complain describe the Defendants' own views, opinions, beliefs or experiences based on numerous other posts on social media, their own experiences or those reported by others, including other of Plaintiffs' customers, governmental/licensing reports, reports by the Humane Society of the United States and KAKE-TV. The statements were made on Facebook, where, as noted in case law, loose and figurative language abounds. Some of the statements are subjective statements of opinion or figurative speech, including the term 'puppy mill,' which the Court finds (consistent with case law regarding this exact term) to be an imprecise term used as rhetorical hyperbole, which cannot be reasonably interpreted as stating actual facts."

The district court determined that the Gumms were required to come forward with evidence of actual malice as an element of their libel claim "because the challenged

statements involve matters of public concern (making them subject to qualified privilege), and because of [the Gumms'] status as limited-purpose public figures for purposes of the issues of this case." The district court further found that the Gumms did not address—either in their briefs or during oral argument—the cases finding that "those who market and promote themselves online, seeking to call attention to a product or service, can be deemed limited purpose public figures."

In discussing actual malice, the district court determined that "none of the facts or arguments in [the Gumms'] submissions raise a potential inference that any of the statements . . . were made with knowing falsity or reckless disregard for the truth." As a result, the district court found that the Gumms had "failed to set forth substantial competent evidence of falsity *or* actual malice for any of the challenged statements." Finally, the district court concluded that the Gumms had failed to come forward with substantial competent evidence of the required element of damages allegedly caused by the statements posed by Dixon and Miller.

On October 4, 2023, the district court held a hearing on the consolidated application for attorney fees and costs under K.S.A. 2023 Supp. 60-5320(g). About two weeks later, on October 19, 2023, the district court entered a journal entry in which it awarded Dixon attorney fees in the amount of $16,174.27 and awarded Miller attorney fees in the amount of $18,355.32. In reaching this decision, the district court found that Dixon and Miller were entitled to recover the amount actually billed by their attorneys for professional services up until the time the application for attorney fees was filed. However, the district court excluded time billed by support staff or law clerks that was not actually billed to Dixon and Miller.

ANALYSIS

*The Issues Presented*

In this consolidated appeal, two issues are presented. First, whether the district court erred in granting the motions to strike filed by Dixon and Miller under the KPSPA, K.S.A. 2023 Supp. 60-5320. Second, whether the district court erred in granting the application for attorney fees under K.S.A. 2023 Supp. 60-5320(g). Although Dixon and Miller also assert that the appellate brief filed by the Gumms fails to comply with Kansas Supreme Court Rule 6.02(a)(5) (2025 Kan. S. Ct. R. at 36), we find that the Gumms' brief substantially complies with the rule. Accordingly, we turn to the merits of the issues presented.

*The Kansas Public Speech Protection Act*

In 2016, the Kansas Legislature enacted the KPSPA, K.S.A. 2023 Supp. 60-5320, which is also known as the anti-SLAPP statute. See L. 2016, ch. 58, § 1. The acronym SLAPP stands for "'strategic lawsuits against public participation.'" *Doe v. Kansas State University*, 61 Kan. App. 2d 128, 135, 499 P.3d 1136 (2021). In other words, anti-SLAPP statutes—such as the KPSPA—are intended to prevent meritless lawsuits that chill free speech.

As this court has explained:

"SLAPP lawsuits are perceived as having a chilling effect on free speech. 33 Loyola L.A. L. Rev. at 805. For that reason, as early as 1992, state legislatures began enacting what is known as anti-SLAPP statutes. André, *Anti-SLAPP Confabulation and the Government Speech Doctrine*, 44 Golden Gate U. L. Rev. 117, 118-19 (2014). The hallmark of these statutes is the ability of a defendant to file an early 'motion to strike' so the court can make an initial determination whether the lawsuit has been filed to harass the defendant or to stifle the defendant's right of free speech. 44 Golden Gate U. L. Rev. at 119." *T&T*

*Financial of Kansas City v. Taylor*, No. 117,624, 2017 WL 6546634, at \*3 (Kan. App. 2017) (unpublished opinion).

The primary purpose of the KPSPA "is to encourage and safeguard the constitutional rights of a person to petition, and speak freely and associate freely, in connection with a public issue or issue of public interest to the maximum extent permitted by law . . . ." K.S.A. 2024 Supp. 60-5320(b). The KPSPA also seeks to protect "the rights of a person to file meritorious lawsuits for demonstrable injury." K.S.A. 2024 Supp. 60-5320(b). As a result, the Kansas Legislature has directed that the provisions of the KPSPA should "be applied and construed liberally [by Kansas courts] to effectuate its general purposes." K.S.A. 2024 Supp. 60-5320(k).

The KPSPA "represents a dramatic departure from typical civil litigation in Kansas" and "provides a mechanism not otherwise available under the Kansas Rules of Civil Procedure for a defendant to seek early dismissal of an action via a motion to strike prior to filing an answer." Phillips and Willoughby, *Game-Changer?*: *The Kansas Public Speech Protection Act*, 91 J.K.B.A. 27, 27 (November/December 2022). Specifically, the KPSPA "'provides a procedural remedy early in the litigation for those parties claiming to be harassed by a SLAPP lawsuit.' [Citation omitted.]" *Doe*, 61 Kan. App. 2d at 135. This procedural remedy allows a party to move to strike a claim if it "is based on, relates to or is in response to [that] party's exercise of the right of free speech, right to petition or right of association." K.S.A. 2023 Supp. 60-5320(d).

On appeal, our standard of review when reviewing a district court's order granting a motion to strike under the KPSPA is de novo because—similar to a ruling on a summary judgment motion—we are in the same position as the district court to answer the legal questions presented. *Doe*, 61 Kan. App. 2d at 136-37; see *Gannon v. State*, 305 Kan. 850, 881, 390 P.3d 461 (2017). In reviewing the decision made by the district court, we "independently examine" the pleadings and supporting affidavits to determine

whether the court's findings and legal conclusions are supported by Kansas law. *Doe*, 61 Kan. App. 2d at 149. To the extent our analysis requires interpretation of K.S.A. 2024 Supp. 60-5320, our review is also unlimited. *Roe v. Phillips County Hospital*, 317 Kan. 1, 5, 522 P.3d 277 (2023).

The analysis used in determining whether a motion to strike under the KPSPA should be granted requires a two-step process. If the movant makes a prima facie case showing that a claim concerns the party's exercise of the right of free speech, right to petition, or right of association, the burden then shifts to the respondent "to establish a likelihood of prevailing on the claim by presenting substantial competent evidence to support a prima facie case." K.S.A. 2024 Supp. 60-5320(d). "In making its determination, the court shall consider pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." K.S.A. 2024 Supp. 60-5320(d).

The language provided by our Legislature in the KPSPA sets forth a specific statutory burden for each party. K.S.A. 2024 Supp. 60-5320(d) states that after the party bringing the motion to strike has shown a prima facie case that the claim falls under the KPSPA, then the responding party has "to establish a *likelihood of prevailing* on the claim by presenting substantial competent evidence to support a prima facie case." (Emphasis added.) In addition, this court has found "[s]ubstantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion." *Fisher v. Kansas Dept. of Revenue*, 58 Kan. App. 2d 421, 423, 471 P.3d 710 (2020).

So, to avoid dismissal of their claim, the responding party must meet the statutory burden to show a prima facie case that they are "likely to prevail" on their claim. *Doe*, 61 Kan. App. 2d at 146; see K.S.A. 2024 Supp. 60-5320(d). This requires a showing that the claim has "merit" and the party has shown a "demonstrable injury." 61 Kan. App. 2d at 145-46.

13

The Gumms rely on *Northeast Comanche Tribe, Inc. v. Stumpf*, No. 123,642, 2022 WL 5293337, at *2 (Kan. App. 2022) (unpublished opinion), to support its position that it has met its burden. In determining whether the responding party has shown a prima facie case, the panel found that the reviewing court should determine "whether the evidence, if unrebutted, would be sufficient to support a verdict or judgment for that party." *Northeast Comanche Tribe,* 2022 WL 5293337, at *2 (citing *Montgomery v. Saleh*, 311 Kan. 649, 653, 466 P.3d 902 [2020]). But as set forth in K.S.A. 2024 Supp. 60-5320(d), the responding party must also show a *likelihood of prevailing* on its claim by presenting substantial competent evidence to support each element of the claim.

In *Doe*, we found that rather than presuming the plaintiff's allegations to be true—as would be the appropriate standard in ruling on a motion to dismiss—courts ruling on a motion to strike brought under the KPSPA must apply the express procedure set forth in K.S.A. 2020 Supp. 60-5320(d). So, once the burden shifts—as it has in the present case—the plaintiff bears the burden of showing a likelihood of prevailing on its claim by presenting substantial competent evidence supporting it. 61 Kan. App. 2d at 147-48. If the plaintiff fails to show a likelihood of prevailing on its claim under this standard, the motion to strike should be granted.

*The Motions to Strike*

Here, the district court found that Dixon and Miller had met their initial burden because the claims asserted by the Gumms in their petition involved the "exercise of free speech, right of association, and right to petition the government." The Gumms do not challenge this determination in their brief nor did they do so at oral argument. We also note that counsel for the Gumms confirmed that they are challenging the district court's ruling only as it relates to their libel claim in this appeal. Accordingly, we turn to the question of whether the Gumms have established a likelihood of prevailing on their libel

14

claim against Dixon and Miller by coming forward with substantial competent evidence to support a prima facie case.

In *Marcus v. Swanson*, 317 Kan. 752, 755-56, 539 P.3d 605 (2023), the Kansas Supreme Court reviewed the development of the law of defamation—which includes both libel and slander—in our state:

> "'The elements of defamation include false and defamatory words, communicated to a third person, which result in harm to the reputation of the person defamed.' *Hall v. Kansas Farm Bureau*, 274 Kan. 263, 276, 50 P.3d 495 (2002). Traditionally, defamation has two variants: libel, a written defamatory statement, and slander, an oral defamatory statement. *Gobin v. Globe Pub. Co.*, 232 Kan. 1, 5, 649 P.2d 1239 (1982) (*Gobin III*). Rather than viewing these as distinct causes of action, in Kansas '"[t]he tort of defamation includes both libel and slander."' *Dominguez v. Davidson*, 266 Kan. 926, 930, 974 P.2d 112 (1999) (quoting *Lindemuth v. Goodyear Tire & Rubber Co.*, 19 Kan. App. 2d 95, 102, 864 P.2d 744 [1993])."

Our Supreme Court further explained:

> "But the right of an individual to seek and obtain redress for defamation is not without limits. See, e.g., *New York Times v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964) (false statements from the media about a public official conducting their official duties were protected by the First Amendment unless the public official could prove the statement was made with actual malice); *Gertz v. Robert Welch Inc.*, 418 U.S. 323, 349, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974) ('States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth.').
> "Shortly after *Gertz*, we issued *Gobin v. Globe Pub. Co.,* 216 Kan. 223, 531 P.2d 76 (1975) (*Gobin I*). Gary Dean Gobin alleged a Dodge City newspaper, published by Globe Publishing Company, printed defamatory statements. Gobin was a hog farmer, and the newspaper printed an article and photos falsely representing that Gobin pleaded guilty to animal cruelty. In fact, Gobin was charged and convicted but he never pleaded guilty, and the criminal case was ultimately dismissed. After his civil trial, the jury awarded

15

Gobin $100,000 in damages. Gobin had not asserted injury to reputation or emotional distress. Globe appealed, and we explained '[t]he controlling issue upon this appeal is whether damage to one's reputation is an essential ingredient in an action for defamation.' 232 Kan. at 4.

"Pertinent to the issues here, we held:

'*Gertz*, as we pointed out in *Gobin I*, effected an immediate change upon the rule in Kansas and in those other states which presumed damages upon the establishment of libel per se, and permitted recovery based upon that presumption. Damages recoverable for defamation may no longer be presumed; they must be established by proof, no matter what the character of the libel.' *Gobin III*, 232 Kan. at 5.

"Further:

'We conclude that in this state, damage to one's reputation is the essence and gravamen of an action for defamation. Unless injury to reputation is shown, plaintiff has not established a valid claim for defamation, by either libel or slander, under our law. It is reputation which is defamed, reputation which is injured, reputation which is protected by the laws of libel and slander.' (Emphasis added.) *Gobin III*, 232 Kan. at 6.

"We have reiterated this holding in subsequent opinions. *Hall*, 274 Kan. at 276, 50 P.3d 495; *Moran v. State*, 267 Kan. 583, 599, 985 P.2d 127 (1999); *Knudsen v. Kansas Gas and Electric Co.,* 248 Kan. 469, 474, 807 P.2d 71 (1991)." *Marcus*, 317 Kan. at 757-58.

Thus, we turn our attention to whether the Gumms have met their burden of showing a prima facie case of libel, which requires a showing of false and defamatory words, communicated to a third person, which result in harm to the reputation of the person defamed and consequent damages.

*Proof of Damages*

The district court found that the Gumms "have failed to set forth substantial competent evidence of damages caused by [Dixon's and Miller's] alleged statements." And as made clear in *Marcus*, the district court found that "Kansas law requires specific proof as to how plaintiffs were damaged professionally, financially, and otherwise." See

16

317 Kan. at 757. Likewise, proof of injury to reputation "requires evidence to establish a causal relationship between the defamatory statements and the injury to [plaintiff's] reputation." 317 Kan. at 759.

In explaining its decision, the district court pointed out that counsel for the Gumms had argued that "[e]verybody knows that you can't believe what you see on the internet . . . ." Yet, the Gumms attempted "to show the existence of . . . damages, though without . . . specifics, . . . by Facebook and the internet." Although the Gumms generically argue that they have suffered a "loss of sales," they have come forward with nothing of evidentiary value to attempt to justify this claim. Moreover, in their brief, they concede that "[i]t is not possible to know the extent of the causation between the Real Nightshades BC Owners Facebook page and loss of sales."

Although the Gumms make a conclusory allegation that they have lost sales because of the statements made by Dixon and Miller, they have failed to come forward with evidence of their alleged financial loss or evidence establishing a causal connection between their alleged loss of sales to any of the statements made by Dixon and Miller. In fact, the Gumms do not even mention their burden to prove damages in the argument section of their brief. Because the challenge to the district court's finding that the Gumms failed to come forward with evidence of damages was inadequately briefed, we find that this argument was abandoned on appeal. See *Great Plains Roofing & Sheet Metal, Inc. v. K Building Specialties, Inc.*, 62 Kan. App. 2d 204, 232, 510 P.3d 1172 (2022).

Even if the Gumms had come forward with evidence of loss of sales, it is just as likely that such losses resulted from their own acts or omissions than it is to conclude that they were caused by Dixon and Miller. This is particularly true in light of the evidence in the record relating to the findings by government agencies regarding their dog breeding operation, the businesses being listed in the 2022 edition of the Horrible Hundred published by the Humane Society, and the associated news coverage. Without coming

17

forward with substantial competent evidence to show a causal link between their alleged damage and the statements posted by Dixon and Miller, the Gumms cannot establish a substantial likelihood of prevailing on their defamation claim.

*Actual Malice*

In addition, the Gumms have failed to come forward with substantial competent evidence of actual malice. Statements about matters of public concern are subject to a qualified privilege under Kansas law, meaning the "actual malice" standard applies in the event of a defamation claim. *Stice v. Beacon Newspaper Corp.*, 185 Kan. 61, 65, 340 P.2d 396 (1959) (granting conditional privilege for statements "which are of legitimate public concern"); *Bosley v. Home Box Office, Inc.*, 59 F. Supp. 2d 1147, 1151 (D. Kan. 1999) (relying on *Stice* in finding that communications in Kansas involving matters of public concern are "qualifiedly privileged," and a plaintiff may only recover after showing actual malice on the part of the defendant).

In *Stice*, the plaintiff sued a newspaper publisher for libel after it printed articles based on information "obtained from the police department and other investigation agencies and from various public officials who had a legitimate concern with the matters under investigation." 185 Kan. at 65-66. The Kansas Supreme Court held that because the articles were about matters of public concern, they were subject to a qualified privilege. As a result, the plaintiff was required to show actual malice in order to prevail on his defamation claim. 185 Kan. at 65-66.

Similarly, in the present case, Dixon and Miller posted on social media about matters of public concern. In particular, a review of the record reveals that both the USDA and the KDA had concerns about the Gumms' dog breeding operation. Likewise, the media and the Humane Society had similar concerns. Furthermore, many of the posts were based on the personal experiences of those who had purchased dogs from one of the

18

various businesses under which the Gumms did business. Like the district court, we conclude that Dixon and Miller are entitled to a qualified privilege. As a result, the Gumms had the burden to come forward with substantial competent evidence of actual malice.

In addition, the Gumms had the burden to come forward with evidence of actual malice because the record supports the district court's determination that they are limited-purpose public figures. As indicated above, a review of the record on appeal reveals substantial competent evidence that the Gumms marketed their dog breeding businesses on various websites, on several social media platforms, and on YouTube. We agree with the district court that because of the Gumms' internet presence and their successful attempts to draw attention to their dog breeding operation, they were limited-public figures and must show actual malice. See *Sellars v. Stauffer Communications, Inc.*, 9 Kan. App. 2d 573, 575-76, 684 P.2d 450 (1984) (discussing actual malice standard for public officials); *Makaeff v. Trump University, LLC*, 715 F.3d 254, 270 (9th Cir. 2013) (business that sparks public debate after extensively advertising its products or services was a limited-purpose public figure). It is also important to recognize that the Gumms fail to challenge the district court's finding on appeal that they are limited-purpose public figures and have waived any argument to the contrary.

To establish actual malice, a plaintiff must show that the person making an allegedly defamatory statement knew that the statement was false or that the person acted with reckless disregard of the truth. *Scarpelli v. Jones*, 229 Kan. 210, 216, 626 P.2d 785 (1981). As the United States Supreme Court has explained, to prove actual malice requires a showing by the plaintiff that the defendant acted with a "'high degree of awareness . . . of probable falsity.' [Citations omitted.]" *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974). Here, we find no such evidence in the record.

Although in one post Dixon claimed that she "hated" the Gumms, dislike of or animus toward an individual is not sufficient—in and of itself—to establish actual malice. First, the plaintiff must come forward with substantial competent evidence to show that the defendant has made a factually false and defamatory statement. Next, the plaintiff must come forward with substantial competent evidence to show that the defendant either knew the statement to be false or that the statement was made in reckless disregard of the truth. *Redmond v. Sun Publishing Co.*, 239 Kan. 30, 36, 716 P.2d 168 (1986).

In this case, we find that the Gumms have failed to come forward with substantial competent evidence to show that Dixon or Miller made statements regarding their dog breeding operation based on actual malice. We note that both Dixon and Miller presented sworn declarations in this case stating their belief that the challenged statements were true. Further, based on our review of the record, we find the statements they made were either grounded on reports issued by governmental agencies or on the personal experiences of people who had purchased puppies from the Gumms.

The Gumms argue that Dixon falsely represented that her puppy, Toby, came from the same bloodline as the border collies bred by Nightshades. But Merry Gumm expressly stated in response to the Better Business Bureau complaint that Toby did share the genetic bloodlines of the Nightshades' dogs. The Gumms also seem to dispute that Toby had epilepsy. Yet there is evidence in the record to support Dixon's claim that Toby was diagnosed by a veterinarian, and there is nothing in the record to show that the diagnosis was incorrect.

In addition, at least four people other than Dixon reported having purchased puppies from the Gumms' dog breeding operation that were subsequently diagnosed with epilepsy. Furthermore, the inspection reports issued by the USDA and the KDA validate the concerns expressed regarding the health and safety of the adult dogs and puppies in

20

the Gumms' breeding facility. Consequently, we find the Gumms' argument regarding actual malice to be unpersuasive and without evidentiary support.

*Factual Falsity*

We also find that the Gumms have failed to come forward with substantial competent evidence to establish that the statements made by Dixon and Miller were factually false. In Kansas, statements that are "substantially true" are non-actionable in defamation and do not satisfy the element of factual falsity. See *Redmond*, 239 Kan. at 37 (if statements are substantially true, there is no liability); *Hein v. Lacy,* 228 Kan. 249, 259-60, 616 P.2d 277 (1980) (slight inaccuracies of expression are not important provided that the defamatory charge is true in substance). When speech is about matters of public concern—as in this case—the plaintiffs bear the burden of proving that the statements were false. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986). Here, the Gumms have not done so.

*Conclusion*

In summary, we find that the district court properly granted Dixon's and Miller's motions to strike under the KPSPA. Based on our review of the record on appeal, we find that the Gumms did not come forward with substantial competent evidence to establish a prima facie case of libel and, as a result, they cannot establish a likelihood of prevailing on this claim. In particular, we find that the Gumms did not come forward with substantial competent evidence to support the essential elements of actual malice, factual falsity, and/or damages.

AWARD OF ATTORNEY FEES

The Gumms also contend that the district court abused its discretion in awarding attorney fees to Dixon and Miller after they succeeded on their motions to strike under

the KPSPA. Here, it is undisputed that the district court had the authority under K.S.A. 2023 Supp. 60-5320(g) to award attorney fees to the prevailing party. K.S.A. 2024 Supp. 60-5320(g)(1) states that the district court "shall award the defending party" costs of litigation and reasonable attorney fees. Where the district court has such authority, we review the amount awarded under an abuse of discretion standard. *Schmidt v. Trademark, Inc.*, 315 Kan. 196, 208, 506 P.3d 267 (2022).

A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *In re Spradling*, 315 Kan. 552, 590, 509 P.3d 483 (2022). "An attorney fee award will not be set aside on appeal when supported by substantial competent evidence. [Citation omitted.]" *In re Marriage of Strieby*, 45 Kan. App. 2d 953, 973, 255 P.3d 34 (2011). The parties asserting the district court abused its discretion—in this case the Gumms—bear the burden of showing such abuse of discretion. *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, 466, 509 P.3d 1211 (2022).

Here, the district court granted the attorney fee application filed by Dixon and Miller with minor exceptions. After reviewing the application as well as the documentation offered in support of the attorney fee request, the district court awarded $16,174.27 to Dixon and $18,355.32 to Miller, for a total award of $34,529.59. In reviewing the reasonableness of an attorney fee award, we look to Kansas Rule of Professional Conduct (KRPC) 1.5(a) (2025 Kan. S. Ct. at 326). *Westar Energy, Inc. v. Wittig*, 44 Kan. App. 2d 182, Syl. ¶ 8, 235 P.3d 515 (2010). In awarding fees, the district court must consider all relevant factors and not merely multiply the time spent by an hourly rate. *Johnson v. Westhoff Sand Co.*, 281 Kan. 930, 949, 135 P.3d 1127 (2006).

The eight factors under KRPC 1.5(a) are:

"(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

"(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

"(3) the fee customarily charged in the locality for similar legal services;

"(4) the amount involved and the results obtained;

"(5) the time limitations imposed by the client or by the circumstances;

"(6) the nature and length of the professional relationship with the client;

"(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

"(8) whether the fee is fixed or contingent." KRPC 1.5(a) (2025 Kan. S. Ct. R. at 326).

Here, the district court explained in its journal entry awarding costs of litigation and attorney fees to Dixon and Miller pursuant to K.S.A. 2023 Supp. 60-5320(g) that it had considered the application, the objections asserted by the Gumms, and the exhibits submitted by the parties. The district court further explained that it had reviewed the legal authority presented in the filings. After doing so, the district court found that an hourly rate of $300 per hour was "fair and reasonable" in the locality for the professional services rendered by defense counsel. The district court also noted that the issues raised pertained to the freedom of speech and constitutional law. The district court found that the defendants' attorneys "provided ample support . . . for their fees."

On appeal, the Gumms argue that the district court did not specifically include findings on its objection to the award of attorney fees in its journal entry. In support of this argument, the Gumms point us to Kansas Supreme Court Rule 165 (2025 Kan. S. Ct. R. at 228), which imposes on the district court the duty to provide adequate findings of fact and conclusions of law on the record to explain the court's decision on contested matters. See K.S.A. 2024 Supp. 60-252. But we do not find that the Gumms objected to the district court's alleged inadequate findings of fact and conclusions of law. As a general rule, an objection is required to give the district court an opportunity to correct

23

any alleged inadequacies. See *In re Guardianship and Conservatorship of B.H.*, 309 Kan. 1097, 1107-08, 442 P.3d 457 (2019).

Based on our review of the record on appeal, we find that the district court properly weighed the factors set forth in KRPC 1.5(a) in awarding costs and fees. In doing so, the district court specifically addressed the hourly rate in its oral ruling:

> "I find the $300 per hour charged to be fair and reasonable for the issues of the case and the locality. The Court does not view the parameters of locality as narrowly as does plaintiff. Cowley County has few attorneys and none that specialize in free speech constitutional law. While Mr. Showalter and Ms. Riggs-Johnson are fine attorneys, they have no special training in this area, and they are very good but general practice attorneys. $300 for specialized law versus $200 for general practice is not unreasonable, especially considering Cowley County does not have such specialized attorneys. . . . In reviewing the time sheets, they include multiple no charges, a reduced hourly fee, and savings of attorney's fees by the limited but efficient use of law clerks and legal assistants. But for the adjustments previously outlined by the Court, defendant's attorney's fees are approved."

The Gumms make some specific objections to various time entries in the defendants' counsel's fee application including claims of duplicative work which they claim should be reduced. However, the defendants' counsel explained to the district court that the hours billed were not duplicative, but instead the hours billed in this case were split between Miller and Dixon. The Gumms also make a general assertion that the requested attorney fees were excessive.

The district court's ruling shows it considered the application for attorney fees thoroughly, as shown by its decision to reduce the fees when it found a reduction appropriate. Although the Gumms provide an alternative calculation of attorney fees, they do not explain how the district court abused its discretion. Any argument of an abuse of discretion—which is their burden to show—is absent from their brief. As a result, they

fail to meet their burden to show that the award of attorney fees was duplicative or excessive. Accordingly, we conclude that the district court did not abuse its discretion in awarding Miller and Dixon their attorney fees as K.S.A. 2024 Supp. 60-5320(g) requires for a prevailing party under the KPSPA.

Affirmed.